STATE

v.

Christopher SANDEN.

No. 92–267–C.A.

Supreme Court of Rhode Island.

June 9, 1993.

Jeffrey Pine, Atty. Gen., Aaron Weisman, Asst. Atty. Gen., for plaintiff.

Richard Casparian, Public Defender, Barbara Hurst, Asst. Public Defender, for defendant.

## OPINION

MURRAY, Justice.

This case comes before us on appeal by the defendant, Christopher Sanden (Sanden), from his conviction of second-degree murder of a two-and-a-half-year-old child, Alexander Fernandez (Alexander). The defendant contends that the trial justice erred in three respects: (1) in failing to instruct the jury that the state bears the burden of proving the defendant was not so intoxicated at the time he committed the act as to reduce the crime to voluntary manslaughter, (2) in abusing his discretion in two aspects of his instructions concerning the jury's determination of whether the defendant's statement was admissible as voluntary, and (3) in abusing his discretion in permitting the state to elicit evidence of the defendant's behavior after the fatal injuries were inflicted upon the child. For the reasons that follow, we affirm the judgment of the Superior Court.

In January 1991, Alexander lived alone with his mother, Bianca Fernandez (Bianca), in a two-bedroom apartment in Cranston, Rhode Island. Bianca had been dating defendant for approximately seven months, and although Sanden never resided with Bianca and her son, he was a frequent guest at the apartment. Prior to January 1991, Alexander had been left in the care of defendant on numerous occasions.

On Monday, January 28, Bianca spent the day with Alexander as she had taken a vacation day from her job. According to Bianca, on that date Alexander had no apparent injuries, nor had he sustained any recent falls that would cause bruising.

Later during that day Bianca and a friend from work, Maryanne Peck (Peck), decided to dine together that evening in Providence. Since Bianca was due to pick up defendant from a gymnasium in Seekonk, Massachusetts, at 6 p.m., she decided to ask Sanden if he would mind staying with Alexander while she and Peck went out. While Bianca was en route to meet defendant in Seekonk, Peck stayed with Alexander, during which time he continual-

ly cried for his mother for approximately one hour. According to Peck, Alexander did not have any noticeable marks or bruises on him, nor did he injure himself while she was there.

Sanden agreed to babysit for Alexander that evening but first requested that Bianca and Peck bring him cigarettes and beer for the duration. Bianca and Peck both drove to a nearby liquor store and purchased cigarettes and a six-pack of twelve-ounce cans of Budweiser. Bianca returned to the apartment to deliver these goods to defendant and noted that her son was in his crib, rocking himself to sleep. Shortly after 8 p.m., Bianca departed for dinner with her friend.

During the course of the evening, Bianca and Peck visited a number of drinking establishments, and they returned to Bianca's apartment at around 12:45 a.m. Before retiring to bed, Bianca checked on Alexander, who was in his crib, lying on his stomach, and dressed in a long-sleeved shirt. At that time she noticed a small bruise near Alexander's eye. She questioned defendant about what had happened, but defendant replied that he did not know and that Alexander had not been out of his crib all night. Bianca dismissed the injury as she believed it was merely caused by his rocking against the sides of his crib.

A short while after Bianca retired to bed, Sanden checked on Alexander and carried him into Bianca's darkened bedroom because Bianca said he sounded congested. Bianca held her son in bed with her for approximately five minutes, during which time she noted that his body felt cold and that he was making whining noises. Concerned with his apparent congestion, Bianca asked defendant whether she should take Alexander to a doctor. Sanden replied yes but then stated that he would not sleep in Bianca's bedroom if Alexander was there because of the noises he was making. Bianca thereafter returned Alexander to his crib in the other bedroom, and both she and Sanden went to sleep.

At approximately 6 a.m., defendant arose and, upon checking on Alexander, found the child to be unresponsive. The defendant immediately woke Bianca and informed her that "[h]e died last night." When Bianca ran to her son's bedroom, she found him lying still, on his back with bruises on his face. She repeatedly asked defendant to call for an ambulance, which he ultimately did by leaving the apartment because Bianca's apartment was not equipped with a telephone. During the few minutes that defendant was not present in the apartment, Bianca lifted her son's nightshirt and noticed a large bruise on his stomach and one on his back. When defendant returned, she questioned him about what he had done to Alexander. The defendant answered, "[H]e fell down the stairs. I'm sorry." Sanden did not reply when Bianca asked him why he had failed to inform her of this when she arrived home earlier that morning.

Members of the Cranston police department and Cranston fire department arrived at the scene between 6:15 and 6:30 a.m. A certified emergency medical technician concluded that the child had been without vital signs for quite some time, and he discontinued efforts to resuscitate him. The rescue team thereafter stepped aside to allow the police officers to secure the scene.

Two police officers who responded to the call to the Cranston apartment observed Bianca and Sanden in the living room. Hysterically crying, Bianca explained to them briefly what had happened. When one police officer asked Sanden for his identification, he informed the officer that he did not have any identification with him, and he continued to explain that "Alex was crying for his mommy. I took him out of the crib to show him that his mother wasn't home. I let him out into the hallway and he fell down the stairs."

A supervising officer who had just arrived on the scene and who was informed of what was believed to have occurred then advised one of the two police officers to read Sanden his constitutional rights. Referring to a rights card that was provided by the police department, one of the police officers read to defendant each of the *Miranda* warnings. After defendant stated that he understood his rights, he was hand-

cuffed, searched, and transported to police headquarters. During this time defendant said nothing more to the Cranston police.

Upon arriving at headquarters and entering an interview room, defendant was uncuffed and once again was informed of his rights by the same patrolman who had read him the *Miranda* warnings at Bianca's apartment. Additionally defendant was given the opportunity to read a rights-waiver form, which delineated each of his constitutional rights. After reading the rights, defendant placed his initials next to each, as requested by the police officer, and checked a box that indicated that he understood his rights. During this time defendant did not inquire about his rights, did not request that an attorney be present, and did not ask to make a telephone call. At this juncture, however, he was not informed of the crime of which he was suspected.

The defendant was then placed in the custody of two detectives within the Cranston police department and moved to a different interview room. A second rights-waiver form was presented to defendant, and he was asked to read it and complete the introductory statement so that it would read, "I, Christopher L. Sanden, am a suspect in the crime of murder." He again initialed each one of his five constitutional rights and checked the line indicating that he understood these rights. During this process defendant asked the detectives present what he should do, to which they replied they could not advise him. Again, however, defendant did not request the presence of an attorney nor the use of a telephone. After approximately five minutes of apparently contemplating what he should do, defendant agreed to speak with the detectives about what had happened.

Without objection by defendant, the detectives taped their interview with Sanden with a microcassette recorder. At the beginning of the recorded statement, one of the detectives again read defendant his rights, which defendant orally acknowledged to have understood. The defendant spoke to the detectives for approximately one hour, revealing the following. Immedi-

ately after Bianca left the apartment on January 28, Alexander began screaming, crying, and trying to get outside. The defendant stated, "I just lost it * * * I couldn't control myself." He confessed that he struck Alexander more than once with a closed fist that evening and that he had struck the child more than once on previous occasions without Bianca's knowledge. The defendant also stated that on the evening of January 28 Alexander had cried so much that he made himself vomit, whereupon defendant attempted to clean him up in the bathtub, but the child again would not stop crying. The defendant then held Alexander's head underwater more than once in an effort to get him to cease crying. In later efforts to stop Alexander's crying, defendant tried suffocating him with his hands and kicked him while he was curled up on the floor. The defendant's statement further revealed that he had consumed six twelve-ounce beers between 8 and 11:30 p.m. that evening.

A grand jury indicted defendant on March 1, 1991, for murder. The case came up for trial in November 1991, and after four days of testimony a jury found Sanden guilty of second-degree murder. The defendant filed a motion for a new trial on November 21, 1991, contending that the verdict was against the law, against the evidence, and against the weight thereof. This motion was denied by the trial justice on December 13, 1991, and defendant was thereafter sentenced to life at the Adult Correctional Institutions. The defendant filed a timely appeal on January 31, 1992.

The defendant raises three issues on appeal. First, he argues that the trial justice committed reversible error in failing to instruct the jury that the state bears the burden of proving that defendant was not so intoxicated as to be unable to harbor a specific intent for the crime of murder. Second, defendant contends that the trial justice abused his discretion in instructing the jury about the law regarding the voluntariness and the admissibility of defendant's statement to the Cranston police. Last, defendant claims that the trial justice abused his discretion in permitting the state to elicit evidence that defendant's be-

havior after the injuries were inflicted contributed to the child's death. We shall address each issue in turn.

## I

The defendant first argues that our decision in *State v. McGehearty,* 121 R.I. 55, 394 A.2d 1348 (1978), requires that the state bear the burden of proving beyond a reasonable doubt that defendant was not so intoxicated as to hinder his ability to form the specific intent necessary for the crime of murder. Although we agree that once a defendant satisfies his burden of production on the intoxication issue, the state has the burden of proving that defendant was not so intoxicated as to negate the specific intent to commit the crime—we do not believe that the issue defendant raises has been properly preserved for review.

The defendant acknowledges in his brief that the instructions given to the jury on the issue of defendant's intoxication were taken verbatim from defendant's request for instructions as submitted to the trial justice. The pertinent charge to the jury included the following:

"There's evidence in this case that the Defendant had consumed alcohol prior to the offense charged. The law says evidence of intoxication may be offered to negate the specific intent charged; that is, an intent to kill. If you find that the Defendant assaulted the deceased, but that the Defendant at the time of the assault was so intoxicated from drinking alcoholic beverages that his drunkedness [*sic*] was of such degree as to completely paralyze the will and take from him the power to withstand evil impulses and render his mind incapable of forming any sane design, you must then, having so determined, find the Defendant guilty of manslaughter.

"Willfulness, premeditation, and deliberation, must concur with malice to constitute murder. These involve an inquiry into the state of mind of the accused at the time of the killing and of conscience. It is proper to inquire whether he was drunk or sober; and if drunk, whether the intoxication rendered him incapable of premeditation and deliberation."

At the conclusion of the trial justice's charge to the jury, counsel for the state and for defendant engaged in a side-bar conference outside the hearing of the jury. At this time defense counsel requested that one instruction be modified to include a recitation of the *Miranda* warnings; at that time defense counsel failed to object to the trial justice's charge regarding the intoxication issue. Additionally defense counsel failed to request either in oral form or in writing an instruction on the state's burden of proving that defendant was not so intoxicated as to negate his specific intent to commit murder. The defendant's inaction with regard to the instruction on the state's burden of proof on the intoxication issue presents a significant obstacle to our review.

Generally issues will not be addressed by this court when raised for the first time on appeal. *State v. Estrada,* 537 A.2d 983, 986–87 (R.I.1988); *State v. Burke,* 522 A.2d 725, 731 (R.I.1987). In *Burke,* however, we recognized that exceptions to this raise-or-waive rule may exist. In that case the defendant argued for the first time on appeal that his constitutional right to confrontation had been violated by the trial justice's exclusion of his witness' testimony. *Burke,* 522 A.2d at 731. In refusing to consider the defendant's constitutional claim, we stated that

"[t]his court's review of questions concerning basic constitutional rights, notwithstanding a defendant's failure to raise the issue at trial, is limited to the following circumstances. First, the error complained of must consist of more than harmless error. Second, the record must be sufficient to permit a determination of the issue. * * * Third, counsel's failure to raise the issue at trial must be due to the fact that the issue is based upon a novel rule of law of which counsel could not reasonably have known at the time of trial. * * * For example, when an intervening decision of this court or of the Supreme Court of the United States establishes a novel constitutional doctrine,

counsel's failure to raise the issue at trial will not preclude our review." *Id.*

Applying the aforementioned guidelines to the case at bar, we must decline to address defendant's claim of error regarding the instruction on intoxication. It is well settled in this state that if specific intent is an essential element of a crime, namely, murder, then the defendant's intoxication may be offered to negate his or her specific intent if it is "of such a degree as to completely paralyze the will of the [defendant], take from him [or her] the power to withstand evil impulses and render his [or her] mind incapable of forming any sane design." *State v. Vanasse*, 42 R.I. 278, 281, 107 A. 85, 86 (1919). *See also State v. Doyon*, 416 A.2d 130, 134 (R.I. 1980); *McGehearty*, 121 R.I. at 59–60, 394 A.2d at 1351; *State v. Turley*, 113 R.I. 104, 112, 318 A.2d 455, 459 (1974). Furthermore, this court stated in *McGehearty* that if the defendant charged with a specific-intent crime presents evidence of his or her voluntary intoxication, then the state is required to prove beyond a reasonable doubt that the defendant was not so intoxicated as to be unable to harbor the requisite specific intent. *McGehearty*, 121 R.I. at 60, 394 A.2d at 1351. We conclude, then, that the issue raised by defendant regarding the instruction on defendant's intoxication is not a novel rule of law in this jurisdiction, and therefore, we shall not review the adequacy of the trial justice's instructions because the matter was not preserved below.

■ We must note, however, that if the intoxication issue had been preserved for review by this court, we would find no error in the trial justice's charge to the jury. Our reading of the record reveals that insufficient evidence was presented by defendant to establish that the extent of his drunkenness was such as to negate the intent required as an element of the crime of murder, namely, malice aforethought or evil intent. Indeed, the only evidence presented was that the victim's mother purchased a six-pack of beer for defendant, that defendant admittedly consumed all six beers between 8 and 11:30 p.m., and that a detective investigating the matter observed six Budweiser beer cans in the wastebasket at Bianca's apartment. There was no testimony at trial regarding, for instance, how much alcohol defendant typically consumed, how much defendant weighed, or how much food defendant had eaten that day, all factors that are relevant to determining whether a person is intoxicated. Because defendant failed to present sufficient evidence to negate his intent to kill Alexander, it was not necessary for the trial justice to charge the jury that the state bears the burden of proving beyond a reasonable doubt that defendant was not so intoxicated as to be unable to form the intent to kill.

II

■ With regard to the jury instruction on the voluntariness of defendant's statement to the Cranston police, defendant maintains that the trial justice abused his discretion in two respects, both of which were brought to the trial justice's attention at the close of his charge to the jury. First, defense counsel objected to the trial justice's failure to delineate the *Miranda* warnings, although the trial justice advised the members of the jury that they might consider whether "the statements were made after a knowing and intelligent waiver of [defendant's] Constitutional rights, and were made freely and voluntarily." Next, defense counsel requested that the trial justice instruct the members of the jury on the consequential use of defendant's statement if they found it to have been made involuntarily. We do not agree that the trial justice erred in either respect.

The record reveals that the jurors had the opportunity to listen to defendant's enumerated constitutional rights in the form of the *Miranda* warnings. Through the testimony of a patrolman and a detective of the Cranston police department and through the playing of defendant's tape-recorded statement, the *Miranda* warnings were read into evidence four times. We conclude, then, that there is ample evidence in the record to support belief in the jury's ability to comprehend defendant's constitu-

tional rights in the context of the voluntariness of defendant's statement.

■ The defendant's contention that the trial justice committed error by not clearly enunciating that the jurors should disregard defendant's entire statement if they found it was made against his will is also without merit. The defendant acknowledges that "a careful reading of the transcript of the judge's charge reveals the clear implication that the statement must be disregarded if the state's burden of showing voluntariness was not met," but he further suggests that "the admonition is easily lost in a lengthy and substantively dense charge." We do not believe that this characterization of the trial justice's charge amounts to prejudicial error, and therefore, we find this argument to be without merit.

### III

■ The last issue raised by defendant questions the propriety of allowing the state to elicit evidence that defendant's behavior subsequent to injuring Alexander contributed to the child's death. During the state's case in chief, the medical examiner who performed the autopsy following Alexander's death testified that the child died from internal hemorrhaging through a stomach rupture caused by blunt-force trauma. The medical examiner also stated that "[t]he mechanism of death in this particular case is reasonably assumed to be shock due to blood loss over a prolonged period of time. Prolonged in this context perhaps being hours, not days. * * * [T]here was evidence of a slow bleed."

The following discourse then took place on direct examination by the state:

"Q: * * * Doctor, the injury where he bled to death, where he bled slowly, had aid been administered early on in this process, could he have been saved? " * * *

"A: In my opinion had the child been brought to a reputable trauma center and examined by even a junior surgical resident, they would have found evidence of significant intra-abdominal hemorrhage and I believe it would have been explored appropriately, and this particu-

lar injury I think was amenable to surgical repair.

"Q: Could have been saved?

"A: Could have been saved."

This testimony was admitted into evidence over objection by defense counsel and after defendant's motion to strike was denied by the trial justice. The defendant now argues that this line of questioning was prejudicial to the defense because it implicitly injected another theory of culpability and because it encouraged the jury to infer defendant's intent to kill from his actions after the assaults rather than at the time the beating was inflicted. We disagree.

Our reading of the record reveals that the state's case was predicated solely on the allegation that the defendant hit Alexander repeatedly on the night of January 28, 1991, which beating caused him to bleed to death while he slept. The trial justice accurately charged the jury about the law regarding such a crime without imparting the separate theory of culpability, namely, failure to render aid, as the defendant now suggests. For these reasons we believe that the trial justice did not err in permitting the medical examiner to testify about whether the child could have been saved and that excluding this testimony would not have altered the jury's verdict in this case.

Accordingly the defendant's appeal is denied and dismissed. The judgment of conviction appealed from is affirmed, and the papers in this case may be remanded to the Superior Court.

LEDERBERG, J., did not participate.