**STATE**

v.

**Thomas C. JOHNSON.**

**No. 94–755–C.A.**

Supreme Court of Rhode Island.

Dec. 1, 1995.

Andrea Mendes, Spec. Asst. Atty. General, Aaron Weisman, Asst. Atty. General, for Plaintiff.

Richard K. Corley, Providence, for Defendant.

## OPINION

WEISBERGER, Chief Justice.

This case came before the Supreme Court on the appeal of the defendant, Thomas C. Johnson, from a conviction of first-degree murder. On appeal the defendant has raised five issues, challenging (1) the probable cause for his arrest, (2) the trial justice's comments during the defense's cross-examination of the defendant's son, (3) the failure to instruct the jury on voluntary manslaughter and dimin-

ished capacity due to intoxication, (4) the preclusion of the defendant's testimony in regard to other possible suspects, and (5) the introduction of a videotaped statement that allegedly included hearsay statements of the interrogating police officer. For the reasons stated, the defendant's appeal is denied and dismissed and the judgment of conviction is affirmed. A summary of the facts insofar as pertinent to this appeal follows.

On the evening of July 31, 1992, defendant and his common-law wife, Margaret Bazinet (Bazinet), accompanied by their two sons and a niece, went to the home of Bobby and Audrey Coogan in Pawtucket, Rhode Island. The couples sat in the kitchen while the children played in an adjoining room. At some point during the evening Bazinet went into the living room to settle an argument among the children. When she returned to the kitchen, defendant assumed that Bazinet had struck one of the children and slapped Bazinet across the face.

Shortly after this incident, defendant departed from the Coogan home alone. As defendant was leaving, at about 10 p.m., his brother, Jerry Johnson (Jerry), arrived at the Coogan residence and remained until approximately 11 p.m., at which time Jerry left with Bazinet and the three children. At trial, Jerry testified that when he drove Bazinet and her two sons to their home in Pawtucket, he saw defendant's car parked in front of the house and saw defendant through the kitchen window.

At 12:26 a.m. the Pawtucket police department received a phone call from a person later identified as defendant. The defendant told the police, "I got a— a— a body on my living room floor at 433 West Avenue, second floor." When asked for details, defendant said he could not "explain it at the moment." When asked whether he needed the rescue team, defendant said, "No" and "I don't think so, but you might be able to send it. It's only next door."

At approximately 12:30 a.m., the rescue team arrived at defendant's home and reported that defendant was standing outside the front door. At trial, William Sisson (Sisson), a Pawtucket firefighter, testified that when he inquired about the problem that precipitated the call, defendant responded, "You will see when we get upstairs." Once upstairs, rescue personnel found Bazinet with multiple stab wounds, injuries to her shoulder, bruises on her arms, and "a very large amount of blood over her right shoulder area."

At approximately 12:32 a.m., Officer Michael Dolan (Dolan) of the Pawtucket police department arrived at the scene. Dolan later testified that as he entered the apartment, he was informed by a member of the rescue team that the victim was dead and that defendant was the only other person in the apartment when rescue personnel arrived. Dolan also testified that as he approached defendant to escort him into the kitchen area, defendant stated, "Yes, I'm the only one here," and "I'm hallucinating, but I haven't been doing any drugs." Dolan also stated that there were no signs of forced entry into defendant's home. Finally, Dolan testified that he entered the kitchen and observed eating utensils, including knives, lying about. He then placed defendant under arrest. After backup officers had arrived and escorted defendant outside, Dolan inspected each room in the apartment and discovered defendant's two young sons asleep in one of the bedrooms.

At approximately 2 a.m., Detective Michael Malloy (Malloy) of the Pawtucket police department arrived at the scene. Malloy testified at trial that during his inspection of the apartment, he was directed by Detective Joseph Vincent Harrold (Harrold) to a knife in the pantry sink. The knife was seized as evidence and presented at defendant's trial. George Lauro, M.D. (Lauro), a board-certified forensic pathologist, testified at trial that the knife was "compatible" with the wounds on the victim's body. Dennis Hillard, acting director of the Rhode Island State Crime Laboratory, testified that test results had confirmed the presence of human blood on that knife. At approximately 2:30 a.m., Malloy left defendant's residence accompanied by Harrold and Detective Linda Stafford (Stafford) and went to the home of Audrey and Bobby Coogan. At trial, Stafford testified that upon entering the Coogan home, she noticed the answering-machine message

light flashing and asked Audrey Coogan (Coogan) to play back the messages. All three were from defendant:

1. "This is Thomas. It's an emergency. Please. Hello. This is an emergency. All right, I'll call the police then. Thank you."
2. "Bobby Bobby. Did I take Maggie home with me? If so, I killed her. Please pick up."
3. "Yeah, Bobby! Tommy Johnson. I think I' m gonna need drastic help. Really. Get a hold of me as soon as you can. Please. Thank you."

At approximately 3:30 a.m., defendant was read his rights, and he agreed to give a videotaped statement to the police. In that statement defendant asserted that he had no recollection of the events from the time he left the Coogan home until he found Bazinet on the floor of their apartment. The defendant claimed that he either came in from outside or woke up on the couch and found Bazinet on the floor, that she was laughing and wanted to make love, and that only when he tried to help her up did he notice the blood on her hair and neck. The police then asked defendant whether he had killed his wife, to which question he responded that he did not know but hoped he had not. On December 17, 1992, defendant was indicted for the murder of Margaret Bazinet. A pretrial hearing was held on July 21, 1994, at which defendant's motions to suppress and dismiss were denied. A jury trial was held from September 16 through 27, 1994.

At trial defendant's eight-year-old son, Shawn Bazinet (Shawn), testified that after he had gone to bed on the night his mother died, he heard his parents arguing and that when he looked into the kitchen through a peephole, he saw his father hit his mother. Shawn stated that his parents then went into the parlor and that he did not see either of them again until his father walked into the bathroom with red paint "all over him." The child testified that he heard his father "washing the paint off" and also saw his father remove a green garbage bag from the house.

The defendant moved for a mistrial after the trial justice commented on defense counsel's extended cross-examination of Shawn. The trial justice denied defendant's motion for a mistrial and offered to give an immediate cautionary instruction, but defendant declined the offer. At the close of his instructions to the jury, the trial justice gave a cautionary instruction in respect to comments that may have been made by the court in the course of the trial. Following Shawn's cross-examination, the state introduced a videotaped interview of the child, made the day after his mother's murder, as a prior consistent statement pursuant to Rule 801(d)(1)(B) of the Rhode Island Rules of Evidence. The defendant's request to have the police officer's comments and inquiries edited out of the tape was denied.

The defendant, who at the time of trial had fully recovered his memory of the night of the murder, testified on his own behalf and denied having killed his wife. The defendant explained that after Bazinet and the children had returned home at around 11 p.m. on the night of the murder, he went "on a couple of errands." He testified that when he came home and found Bazinet lying on the parlor floor, he thought she had fallen and also thought that she said something about wanting to "fool around," so he unsnapped her pants and tried to get her up to go to bed. The defendant testified that at that point he noticed the blood and the wound on her neck and then phoned the Coogans and the police.

When defendant was asked whether he knew if the victim had any enemies that might have been capable of killing her, the trial justice sustained the prosecutor's objection on grounds that the question called for speculation. At the end of trial, defendant sought an instruction on manslaughter and on intoxication as a basis for diminished capacity. The trial justice found no evidence to warrant such an instruction, and defendant objected to the court's failure so to instruct the jury.

On September 27, 1994, the jury found defendant guilty of murder in the first degree. The defendant's motion for a new trial was denied on October 18, 1994, and he was sentenced to a mandatory life sentence. On October 25, 1994, defendant filed a timely notice of appeal, pursuant to G.L.1956 (1985 Reenactment) § 9–24–32. The defendant

has raised five issues in support of his appeal. Further facts will be supplied as necessary to deal with these issues.

### 1. Probable Cause

■ The defendant contended that the police had no probable cause to arrest him and that his statement following that arrest should have been suppressed. We disagree. This court will not reverse a trial justice's decision on a motion to suppress unless we determine that it was clearly erroneous. *State v. Garcia*, 643 A.2d 180, 188 (R.I.1994). A warrantless arrest is legal, and the fruits of the arrest are admissible, if the arresting officer had probable cause to believe the suspect had committed an offense. *State v. Brennan*, 526 A.2d 483, 485 (R.I.1987).

■ "Probable cause to arrest exists if, at the time of the arrest, the arresting officer had knowledge of facts and circumstances, based on reasonable and trustworthy information, sufficient to cause a prudent officer to believe that the suspect had committed * * * a crime." *Brennan*, 526 A.2d at 485. This court reviews defendant's claim that he was arrested without probable cause by independently examining the record in light of "the mosaic of facts and circumstances * * * viewed cumulatively 'as through the eyes of a reasonable and cautious police officer on the scene, guided by his or her experience and training.'" *In re Armand*, 454 A.2d 1216, 1218 (R.I.1983). The defendant asserted that "[t]he sole incriminating fact relied upon by the officer appears to be that Thomas Johnson was the only adult in the apartment" when the arresting officer arrived. The defendant compared his arrest with the arrest we invalidated in *State v. Mattatall*, 510 A.2d 947 (R.I.), *vacated on other grounds*, 479 U.S. 879, 107 S.Ct. 265, 93 L.Ed.2d 243 (1986). In that case a body had been found by Mattatall's wife with indications that the victim had committed suicide. Police questioned Mattatall at the scene and observed that he was agitated. The police then detained him and brought him to the station, without even suspecting that he had committed a crime. 510 A.2d at 949. The arresting officer's only reason for detaining Mattatall was that he seemed nervous. We concluded

"as a matter of fact that Mattatall was brought involuntarily to the police station for interrogation even though the police did not suspect him and had no probable cause to believe that he was guilty of a crime." *Id.* at 950. We are of the opinion that our holding in *Mattatall* is not applicable to the instant case.

■ In this case one could not gainsay the fact that the woman on the floor with multiple stab wounds to her neck was the victim of a homicide, not a suicide. The victim was the defendant's wife. The defendant resided in the apartment where the victim was found and was the only adult present at the crime scene. There were no signs of forced entry, nor did defendant proffer any explanation for his wife's murder. Moreover, defendant had told the arresting officer and rescue personnel that he was hallucinating but that he had not taken any drugs. In light of the arresting officer's four years' experience on the police force and the mosaic of facts and circumstances before him, it is our opinion that the arresting officer had ample evidence to conclude that defendant had committed a crime and that the trial justice correctly denied defendant's motion to suppress his statement.

### 2. Comments of the Trial Justice

The defendant contended that the trial justice's comments at the end of his re-cross-examination of his son Shawn were improper and prejudiced the outcome of the trial.

"THE COURT: You're reversing your whole story now by asking these questions. You have eliminated everything that he admitted before. That is what happens when you go too far on cross-examination, Mr. Corley. All right you may step down, son."

The defendant further argued that this prejudice was incurable and that a mistrial should have been granted. The state, on the other hand, argued that any prejudice resulting from the trial justice's remarks was cured by the cautionary instruction given to the jury at the close of the trial.

■ After the trial justice rebuked defense counsel for going "too far" in his cross-

examination of Shawn, defendant moved for a mistrial. That motion was denied. The trial justice determined that a curative instruction to the jury would be sufficient to counter any prejudicial effects that could have resulted from his statements. He offered to issue the instruction immediately, but defendant declined that offer. The trial justice did admonish the jury as follows at the close of his instructions to the jury:

> "Finally, and this is important, I wish to make it perfectly clear to all of you that neither by these instructions, nor by any ruling or remark or comment that I have made during the trial, have I or do I intend to indicate to any of you any opinion which I may have regarding the issues and facts and the evidence before you. Will you remember that, please, in your deliberations."

This court has held that a trial justice has an imperative obligation to refrain from disclosing any opinion on the weight or the credibility of evidence before a jury. *State v. Mastrofine*, 551 A.2d 1174, 1176 (R.I.1988). The decision to grant a mistrial, however, is within the sound discretion of a trial justice. *State v. Toole*, 640 A.2d 965, 974 (R.I.1994). Even if a trial justice determines that a particular remark was prejudicial, he or she may reasonably determine that a timely and effective cautionary instruction would cure the prejudice. *Id.*

Moreover, this court has expressly held that the remarks of a trial justice may create incurable prejudice. *State v. Wiley*, 567 A.2d 802 (R.I.1989); *State v. Dame*, 488 A.2d 418 (R.I.1985). In *Wiley* we reversed a robbery conviction after determining that the Superior Court justice had incurably prejudiced the outcome of the case by explicitly expressing his opinion on a disputed issue in the presence of the jury. Specifically, the trial justice in *Wiley* estimated the length of time a robbery victim had observed the face of her assailant. These estimates were based on "a less-than-ideal series of courtroom experiments." 567 A.2d at 805. Similarly in *Dame* we invalidated an arson conviction that resulted after the trial justice summarized only the direct-examination testimony of an expert witness, omitting the cross-examination

testimony. In that case we held that "the importance of the testimony involved made the summary by the trial justice of only direct testimony inadequate and potentially misleading to the jurors." 488 A.2d at 423.

■ We are of the opinion that the trial justice in the instant case did not disclose any opinion about a crucial fact at issue, nor did he utter any statements that may have misled the jurors. He did not indicate whether he believed Shawn's testimony but merely indicated his disapproval of defense counsel's tactics in relentlessly questioning an eight-year-old boy on cross-examination.

■ Although we have concluded that the trial justice's comments did not create inexcusable prejudice, we nevertheless point out that the trial justice's comments regarding the tactics of trial counsel in the presence of the jury were ill advised. We are satisfied, however, that the trial justice in this instance adequately remedied any prejudice that may have followed his remarks by admonishing the jury not to interpret any comments from the bench as indicative of the justice's opinions.

### 3. The Failure to Instruct the Jury on Voluntary Manslaughter and Diminished Capacity Due to Intoxication

On appeal defendant argued that the trial justice erroneously refused to instruct the jury on voluntary manslaughter and diminished capacity because of intoxication. The defendant contended that there was sufficient evidence to warrant such an instruction. We disagree.

"It is well established that a criminal defendant is entitled to an instruction on a lesser included offense if such an instruction is warranted by the evidence." *State v. Figueras*, 644 A.2d 291, 294 (R.I.1994) (citing *State v. Messa*, 594 A.2d 882, 884 (R.I.1991)). It is also well settled that "if specific intent is an essential element of a crime, namely, murder, then the defendant's intoxication may be offered to negate his or her specific intent if it is 'of such a degree as to completely paralyze the will of the [defendant], take from him [or her] the power to withstand evil impulses and render his [or her] mind incap-

able of forming any sane design.'" *State v. Sanden,* 626 A.2d 194, 199 (R.I.1993) (quoting *State v. Vanasse,* 42 R.I. 278, 281, 107 A. 85, 86 (1919)).

In *Sanden* the defendant failed to preserve the issue of whether an instruction on a lesser included offense should have been given because of his intoxication. Nevertheless, the court noted that even if the question had been properly preserved, the evidence was insufficient to establish such drunkenness as to negate the intent required to prove murder. In *Sanden* the evidence showed only that the defendant had consumed a six-pack of beer in three and a half hours. This court pointed out that there was no testimony regarding how much alcohol the defendant typically consumed, how much the defendant weighed, or how much food the defendant had eaten that day, all of which were relevant factors in determining the degree to which a person would become intoxicated. *Sanden,* 626 A.2d at 199.

■ In the instant case there was testimony that defendant had been drinking the afternoon and evening before his wife's murder. No evidence, however, was presented on how much defendant had drunk or how much he had eaten or how much he weighed. In addition, despite defense counsel's suggestions that defendant was intoxicated, defendant himself testified that he was "more tired than too much to drink." The defendant's brother, Jerry, testified that defendant had been drinking the evening of the murder and also testified to the fact that defendant drank frequently. Nevertheless, nothing in Jerry's testimony indicated that defendant was so intoxicated on the night of the murder as to be incapable of forming the intent to commit murder. Finally, defendant's own testimony demonstrated that he had the capability to run "errands" on the evening in question and the capacity to make three phone calls to the Coogans and one to the police. Specifically, defendant testified that between the time his wife and the children returned home, around 11 p.m., and the time he phoned the police, at 12:26 a.m., he drove by the Coogan residence, but did not stop because the kitchen light was turned off; that he proceeded to the Sunshine Lounge, where he stayed only

five to ten minutes because the person he wanted to see was not there; that he drove to the Jake Cartier Club but did not enter that establishment because he could not find a legal parking place; that he went by the Bull's Eye Club but did not stop because "Charles' truck" was not there; and that then he returned home.

Our careful study of the record reveals that insufficient evidence was presented even to suggest or raise the issue that defendant was intoxicated to such a degree as to negate the specific intent required for murder. Testimony that defendant drank on the afternoon and evening of the murder and that defendant drank frequently fell well short of demonstrating that defendant's will was so paralyzed that he was unable to "withstand evil impulses [or to form] any sane design." *Sanden,* 626 A.2d at 199. Therefore, we conclude that the trial justice properly refused to instruct the jury on manslaughter by reason of diminished capacity.

**4. Defendant's Testimony about Enemies of His Wife Capable of Murder**

The defendant assigned error to the trial justice's ruling that prevented defendant from testifying about whether his wife had enemies capable of murdering her. During redirect examination of defendant the following exchange took place:

"Counsel: [The prosecutor] asked you about you being out of the home when someone must have come in and killed your wife, do you remember that?

"Defendant: Yes.

"Counsel: Do you know whether or not Margaret had any enemies that might have been capable of that?

"Prosecution: Objection. It calls for speculation and also—

"Court: Sustained.

"Counsel: He asked you about your telephone calls to Bobby Coogan, do [you] remember that?"

We observe as a preliminary matter that defendant did not preserve for appeal the question of whether he should have been allowed to testify about enemies of his wife capable of murdering her. It is a well-set-

tled principle of appellate law that a claim of error, although briefed and argued at the appellate level, is deemed waived if not effectively raised at trial. *State v. Rivera*, 640 A.2d 524, 526–27 (R.I.1994); *State v. Toole*, 640 A.2d at 972–73; *State v. Burke*, 529 A.2d 621, 627 (R.I.1987). Upon the state's objection to the question and the court's sustaining the objection, defense counsel simply moved on with an unrelated line of questioning. He made no offer of proof, nor did he articulate any rationale for allowing defendant to respond to the question, nor did he attempt to rephrase the question. Consequently, we need not reach the merits of defendant's claim.

 In the event this issue had been preserved for review by this court, however, we would affirm the trial justice's ruling. The trial justice found, as an evidentiary matter, that the question asked defendant by defense counsel was improper, and he sustained the state's objection that the question called for speculation on defendant's part. Matters of relevancy and admissibility are left to the sound discretion of trial courts. *State v. Cardoza*, 649 A.2d 745, 749 (R.I. 1994). We shall not disturb a trial justice's decision on an evidentiary issue unless that decision constitutes an abuse of the justice's discretion that prejudices the complaining party. *Id.; State v. Germano*, 559 A.2d 1031, 1036 (R.I.1989). The trial justice did not err in refusing to permit defendant to testify about enemies of his wife capable of murdering her because the question by defense counsel called for speculation by defendant in respect to the states of mind of these hypothetical enemies.[1] *See* R.I.R.Evid. 701.

**5. Trial Justice's Admission of Video-taped Interview of Shawn Bazinet without Redacting Interviewer's Questions**

The defendant claimed on appeal that the videotaped interview of his son, Shawn, should not have been admitted without redaction of the police interviewer's questions and asserted that the interviewer's questions should have been excluded as inadmissible hearsay. The defendant, however, did not contest the admissibility of his son's statements on the videotape as prior consistent statements pursuant to Rule 801(d)(1)(B) of the Rhode Island Rules of Evidence.

 It is axiomatic that an out-of-court statement is not hearsay unless it is offered for the truth of the matter asserted. *State v. Brash*, 512 A.2d 1375, 1379 (R.I. 1986); *State v. Coppola*, 502 A.2d 802, 804 (R.I.1985); *State v. Poulin*, 415 A.2d 1307, 1309 (R.I.1980). The questions the police officer asked of Shawn were not offered for *the truth of any matter asserted therein* but merely to provide a framework within which Shawn's answers could be understood. Moreover, the introduction at trial of inadmissible hearsay can serve as the basis of reversal only if prejudice to the defendant results. *State v. Fortier*, 427 A.2d 1317, 1325 (R.I.1981). If there exists a "reasonable possibility that the error complained of contributed to the conviction," then the error is not harmless. *State v. Robalewski*, 418 A.2d 817, 824 (R.I.1980).

 In light of the totality of the evidence presented in the case against the defendant, we are of the opinion that the admission of the interviewing officer's questions was not a contributing factor to the defendant's conviction for the murder of his wife. Our conclusion is buttressed by the fact that the police interviewer testified at the defendant's trial, thereby providing defense counsel ample opportunity for cross-examination of the officer in order to minimize any possible effects his videotaped comments may have had.

In conclusion, the defendant's appeal is denied and dismissed. We affirm the judgment of conviction entered in the Superior Court. The papers in the case may be remanded to the Superior Court.

---

1. We emphasize that, contrary to defendant's contention, the trial justice's ruling only prevented defendant from testifying about whether any of his wife's enemies were *capable* of committing murder. The defendant made no further attempt to establish that anyone else had motive or opportunity to kill defendant's wife, and he cannot now claim that he was precluded from doing so.

Justice LEDERBERG was unable to be present at oral argument but participated on the basis of the briefs.