STATE

v.

**Mariano JIMENEZ.**

No. 2003–640–C.A.

Supreme Court of Rhode Island.

June 24, 2005.

Virginia M. McGinn, Providence, for Plaintiff.

Janice M. Weisfeld, Providence, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

ROBINSON, Justice.

The defendant, Mariano Jimenez, was convicted by a jury of first-degree murder (count 1), felony assault (count 2), and carrying a pistol without a license (count 3).[1] He has appealed to this Court, contending that the trial justice committed reversible error (1) in permitting him to be questioned concerning his previous experience with the pistol that fired the fatal shot and (2) in failing to instruct the jury on the lesser-included offense of manslaughter because of his alleged diminished capacity.

### Facts and Travel

In the early morning hours of April 9, 2000, defendant fatally shot one Manuel Clemente in the back of the neck as Clemente was leaving an apartment building on Dartmouth Avenue in Providence. Both Clemente and defendant had been attending a party in a second-floor apartment, where Clemente's former girlfriend, Dania Martinez, lived.[2] At the party, which was

---

1. Before trial, defendant had entered a plea of guilty to a charge of possession of a firearm by a fugitive from justice (count 4). Upon defendant's conviction of the other charges, the trial justice sentenced him to serve a term of life imprisonment on count 1 with a concurrent ten-year term of imprisonment on count 4. In addition, and consecutive to the time to be served on counts 1 and 4, the trial justice sentenced defendant to serve concurrent ten-year suspended terms of imprisonment, with probation, on the two remaining counts.

2. It appears that Dania had ended her relationship with Clemente approximately two weeks before the party. It also appears that, while they were dating, their relationship had been tumultuous and fraught with problems.

being held in honor of Dania's sister, Altagracia Martinez, defendant and Clemente became involved in the altercation that is described in greater detail in the next paragraph and in Part II of the "Analysis" section of this opinion.

At trial, defendant took the stand in his own defense. He testified that, while he and Dania were dancing, Clemente and Dania began to argue and shout at each other. The defendant further testified that afterwards, while he was sitting on a chair, Clemente and another male approached him in a threatening manner. The defendant then testified that, in reaction to the approach of the two men, he pulled out a concealed gun from his waistband, cocked it and ordered Clemente and the other man to "move away."[3] A confused scene then took place in the apartment, during which, according to defendant's testimony, he was hit on the side of his head, and he then fired a shot within the apartment. The defendant further testified that, after he fired the gun in the apartment, Clemente was "hitting" him, so he tried to fire the weapon again. In doing so, defendant "pressed the trigger again but [the] shot didn't go, [the gun] didn't shoot."

At that point, the altercation between defendant and Clemente moved from the apartment into the adjacent hallway. The defendant testified that Clemente threatened to kill him[4] and also that, as Clemente ran towards the staircase, he told defendant that he would "be back now."

The defendant testified that he understood Clemente's statement to be a threat

and that he "tried to charge the gun again because [Clemente] said he was going to come back." In so doing, defendant said that he "found the shell inside [the gun] then I pull it but I had my trigger finger in trigger still present because I was very scared." He further testified that "I was trying to see what was going on with the gun and I found out the shell inside—it stuck right there. I pulled it out and the gun went off * * *." It was this last discharge of the gun that caused Clemente's death.

At that point, defendant left the scene of the crime. Later that day, he presented himself at the Providence police station. The police arrested defendant after they discovered that there was an active warrant for his arrest in New York. Thereafter, defendant was indicted by the grand jury on charges of murder, felony assault, carrying a pistol without a license and possession of a firearm by a fugitive from justice. As described in greater detail in footnote 1, *supra*, defendant voluntarily entered a plea on the last-mentioned count, and a jury thereafter found him guilty of the remaining charges. This appeal followed.

## Analysis

### I. The Evidentiary Ruling

■ The defendant's main defense at trial was that the shooting of Clemente was accidental. He alleged that the weapon accidentally discharged while he was in the process of trying to dislodge a bullet that had become jammed in the pistol.

---

3. The defendant later testified that the weapon he used in the shooting was an unlicensed .380–caliber handgun that he had purchased in New York and had brought with him to Rhode Island. He also testified that he had the weapon in his possession from the moment that he arrived at the party until the time of the shooting.

4. A neighbor, Yvette Mendez, testified to the contrary that she heard defendant threaten to kill Clemente. Specifically, she stated: "[Jimenez] said 'I'm going to kill you.' He was very upset. Then when I saw him rub the gun."

The defendant asserts that the trial justice committed reversible error when he permitted questions on cross-examination about whether defendant had ever fired the weapon before the night of the fatal shooting. He maintains that such questions were inadmissible under Rule 404(b) of the Rhode Island Rules of Evidence because they sought to elicit impermissible evidence of bad character. The defendant further asserts that the trial justice compounded his error by failing to give a cautionary instruction and by improperly interjecting himself into the cross-examination of defendant.

The disputed questioning reads as follows in the trial transcript:

"Q. So, this [i.e., the final discharge of the gun] was a mistake?

"A. Well, like it happened like came to be. He was like a mistake, or something like that.

"Q. But that is not the first time you fired that gun?

"A. No, sir; I fired it inside.

"Q. I'm sorry?

"A. No; I fired it inside before.

"Q. Why, and that is—that wasn't the first time you fired the gun?

"[DEFENSE COUNSEL]: Objection. Relevance.

"THE COURT: Let him answer. How many times have you fired the gun?

"[DEFENSE COUNSEL]: Time span?

"[PROSECUTOR]: Since he owned it.

"[DEFENSE COUNSEL]: Objection.

"THE COURT: Overruled.

(Pause)

"Q. Do you remember the question?

"A. Yes, sir.

"Q. You fired that gun before that night, haven't you?

"A. Before the night?

"Q. Yes?

"A. Yes.

"Q. How many times?

"A. One.

"Q. One other time?

"A. One time.

"Q. Did you mean to fire it that time?

"A. Yes.

"Q. Did it work that time?

"A. It worked, yes.

"Q. Were you shooting at a live person that time?

"[DEFENSE COUNSEL]: Objection.

"THE COURT: Move on * * *."

The defendant asserts that these questions were irrelevant and prejudicial and that their only purpose was to demonstrate that he was a bad person who was acting in conformity with his bad character. Assuming without deciding that defendant made a sufficient objection to this line of questioning,[5] we conclude that this contention is without merit.

 This Court reviews evidentiary rulings concerning the scope and extent of cross-examination only for abuse of discretion and only when the ruling has caused prejudice to the moving party. *See State v. Sivo*, 809 A.2d 481, 490 (R.I.

5. *See* Rule 103(a)(1) of the Rhode Island Rules of Evidence; *State v. Neri*, 593 A.2d 953, 956 (R.I.1991) ("[When] the introduction of evidence is objected to for a specific reason, other grounds for objection are waived and may not be raised for the first time on appeal."); *see also State v. Bettencourt*, 723 A.2d 1101, 1107 (R.I.1999); *State v. Toole*, 640 A.2d 965, 972 (R.I.1994).

2002) ("A trial justice's evidentiary rulings during cross-examination will be disturbed only in situations in which an alleged abuse of discretion caused prejudice to the moving party."); *see also State v. Roderigues*, 656 A.2d 192, 194 (R.I.1995); *State v. Benevides*, 420 A.2d 65, 69 (R.I. 1980). Questions that are calculated to explain, contradict, or discredit a witness's direct examination testimony are permitted on cross-examination, as are questions designed to test the accuracy, memory, veracity, or credibility of the witness. *Benevides*, 420 A.2d at 69.

■ Even though a defendant's independent and unrelated past criminal activity may be of the same type as the particular crime charged, evidence of such criminal behavior is generally inadmissible. *See State v. Jalette*, 119 R.I. 614, 624, 382 A.2d 526, 531 (1978); *see also State v. Brash*, 512 A.2d 1375, 1382 (R.I. 1986). That is because such evidence is not only irrelevant, but may also be unduly prejudicial and cause confusion in the minds of the jurors and divert their attention from relevant evidence. *Brash*, 512 A.2d at 1382; *Jalette*, 119 R.I. at 624, 382 A.2d at 531.

■ By way of exception to the general prohibition against admitting evidence of prior bad acts, Rule 404(b) permits the admission of evidence of other crimes, wrongs, or acts when such evidence is offered to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or to prove that defendant feared imminent bodily harm and that the fear was reasonable." [6] Even when admissible, however, "this type of evidence should be sparingly used by the prosecution and only when reasonably necessary." *Jalette*, 119 R.I. at 627, 382 A.2d at 533.

By testifying that the killing of Clemente was directly attributable to the malfunctioning of his gun, defendant opened the door to questions about his previous experience with that specific gun. The defendant made the purported mechanical unreliability of his gun an issue in this case. Therefore, questions concerning defendant's familiarity with the particular loaded gun that he had brought with him to the party (and concerning the previous performance of that gun) certainly were relevant and appropriate for the prosecutor to ask on cross-examination.[7] They related directly to defendant's argument

6. Rule 404(b) of the Rhode Island Rules of Evidence provides in pertinent part:

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or to prove that defendant feared imminent bodily harm and that the fear was reasonable."

7. The defendant relies upon our decision in *State v. Evans*, 618 A.2d 1283 (R.I.1993) in support of his argument. It is clear, however, that the holding in that case is readily distinguishable from the case before us. (In this footnote we prescind from the fact that the crucial questioning in *Evans* was done by the

trial justice. We shall deal with that important aspect of *Evans* in the next footnote.)

The defendant in *Evans* was convicted of assault with intent to murder. During cross-examination, the defendant, who had "admittedly fired a gun at the victim in an effort to scare him off," testified that "he was afraid that if he shot too low, the bullet would hit the concrete sidewalk and ricochet." *Id.* at 1284. Thereafter, the trial justice who was presiding over the case questioned the defendant about his prior experience with guns. In sustaining the defendant's appeal in that case, this Court concluded that, when the trial justice questioned the defendant about his prior experience with guns, she acted improperly because her questioning did not serve to clarify any confusing matter for the jury. *Id.*

In contrast to the factual context in *Evans*, where the defendant admittedly intended to

that Clemente's death was the result of an accident or mistake. Thus, the trial justice did not abuse his discretion in allowing such questions.[8]

## II. Diminished Capacity

■ During the trial, there was testimony that defendant had consumed alcohol while he attended the party. The defendant contends that there was sufficient evidence in the record concerning his high degree of intoxication to warrant a jury instruction on the lesser-included offense of diminished-capacity manslaughter. He maintains that the trial justice committed reversible error in refusing to so instruct the jury.

■ It is an established principle that "a criminal defendant is entitled to an instruction on a lesser included offense if such an instruction is warranted by the evidence." *State v. Hockenhull,* 525 A.2d 926, 930 (R.I.1987); *see also State v. Johnson,* 667 A.2d 523, 528 (R.I.1995); *State v. Figueras,* 644 A.2d 291, 294 (R.I.1994).

■ It is also an established principle of criminal law that "voluntary intoxication does not excuse the commission of an offence." *State v. Vanasse,* 42 R.I. 278, 281, 107 A. 85, 86 (1919). In appropriate circumstances, however, where a defendant is on trial for murder, his or her intoxication may be offered to negate the essential element of specific intent. *See State v. Sanden,* 626 A.2d 194, 199 (R.I.1993); *see also State v. Correra,* 430 A.2d 1251, 1254 (R.I.1981) (recognizing that "a successful

---

fire his weapon, defendant in the present case testified that, as he was trying to dislodge a bullet that had become stuck in the weapon, the gun malfunctioned and accidentally fired the fatal shot. Moreover, unlike the questioning at issue in *Evans,* the challenged questioning in this case was not related to defendant's *general* knowledge about and experience with firearms, but rather was focused with specificity on defendant's familiarity with the actual allegedly malfunctioning weapon that killed Clemente.

8. Furthermore, contrary to defendant's assertion, the trial justice did not improperly interject himself into the cross-examination of defendant; rather, he merely reworded a question already asked by the prosecutor. The record testimony reveals that the prosecutor legitimately asked defendant about his prior experience with the particular gun used to kill Clemente. Specifically, the prosecutor asked: "Why, and that is—that wasn't the first time you fired the gun?" Defense counsel made an objection on relevance grounds, to which objection the trial justice responded in the following words: "Let him answer. How many times have you fired the gun?" The question as phrased by the trial justice (right after he overruled defendant's evidentiary objection) merely restated, in a slightly different way, the prosecutor's original ques-

tion concerning defendant's previous use of the gun. In view of this contextual background, there was no abuse of discretion by the trial justice when, after dealing with an objection interposed by defendant's counsel, he simply rephrased the question to the witness so that the trial process could move along in an efficient manner. This scenario is to be contrasted with the scenario at issue in *Evans,* 618 A.2d at 1284, where the trial justice did far more than simply rephrase a question that had already been asked.

It is true that, when a trial justice deems it necessary and proper, he or she may question a witness about relevant matters. *State v. Amaral,* 47 R.I. 245, 249–50, 132 A. 547, 549 (1926); *see also State v. Giordano,* 440 A.2d 742, 745 (R.I.1982). Nevertheless, it should be reiterated that a trial justice should conduct such questioning "only reluctantly." *Giordano,* 440 A.2d at 745. And the trial justice should do so only when he or she has determined that such questioning will help to "elicit the truth and will clarify a matter which he justifiably feels is a cause for confusion in the minds of the jurors." *Id.* When such questioning occurs, the trial justice should exercise caution to avoid any appearance of a lack of judicial impartiality. *Amaral,* 47 R.I. at 250, 132 A. at 549–50; *see also State v. Figueras,* 644 A.2d 291, 293 (R.I. 1994).

.

defense of diminished capacity does not free a defendant but instead results in the conviction of a lesser included offense").

It is further well established that a defendant may be cognitively impaired to some extent due to voluntary intoxication and yet still possess the capacity to premeditate and to form the specific intent to commit murder. *State v. Amazeen*, 526 A.2d 1268, 1272 (R.I.1987). To be entitled to a diminished-capacity manslaughter instruction by reason of intoxication, the level of intoxication must be "of such a degree as to completely paralyze the will of the respondent, take from him the power to withstand evil impulses and render his mind incapable of forming any sane design." *Vanasse*, 42 R.I. at 281, 107 A. at 86; *see also State v. Edwards*, 810 A.2d 226, 235 (R.I.2002); *Johnson*, 667 A.2d at 528–29; *Amazeen*, 526 A.2d at 1272 ("Before a trial justice is required to give an instruction on manslaughter by reason of diminished capacity the evidence, however minimal, must permit a reasonable jury to find that the defendant, due to his or her diminished capacity, was incapable of forming a specific intent upon which malice could be predicated.").

The defendant maintains that the trial justice erred in denying his request for a diminished-capacity jury instruction because, according to defendant, there was sufficient evidence adduced at trial to warrant such an instruction.[9] To support his argument, defendant contends that there was evidence of the following: (1) that he consumed approximately eighteen beers during the fourteen-hour period that he was at the party; (2) that he did not feel normal; (3) that he was not acting like himself; and (4) that he was drunk.

There was testimony that defendant had been drinking while he was at the party. Although other witnesses were unable to testify as to how much alcohol defendant had consumed, his own testimony was that he drank "[w]ell, like, eighteen beers" between the time that he arrived at the party and the time of the shooting.[10] During direct examination, defendant was asked about his level of intoxication when he shot Clemente. Specifically, he was asked:

"Q. And were you intoxicated at that time?

"A. You mean drinking? No.

"Q. No? Were you drunk?

"A. I was—I didn't feel—I didn't feel very well because he was—I was now feeling myself very comfortable, you know. I was drinking whole day. I didn't feel that was normal in any way.

"Q. Didn't feel you were normal?

"A. I mean, I didn't feel that I was acting like myself. I thought I was—yes, let's say I was drunk, something like that." [11]

There was nothing, however, in defendant's testimony to suggest that he was intoxicated to such a degree as to negate the specific intent necessary for murder. Indeed, the evidence, particularly defendant's own testimony at trial, is quite inconsistent with the theory of his having

9. The great majority of the facts that are set forth in this portion of the opinion are taken from defendant's own trial testimony.

10. There is nothing in the record to indicate how much defendant may have eaten during this same period, although it is clear that some food was available at the party. (*See* discussion *infra* concerning the beans that were cooked by defendant and then brought by him to the party.)

11. It is noteworthy that, even when addressing the subject of his own possible drunkenness, defendant testified in a hesitant manner that was substantially different in tone from an unequivocal affirmation.

been intoxicated to that extent; the record is replete with concrete examples of defendant's ability to act in a rational and purposeful manner at all relevant points in time. Some instances of that rational and purposeful behavior by defendant are described below.

The defendant, who lived on the first floor of the apartment building where the murder occurred, had gone in the early afternoon of April 8, 2000, to a party hosted by his second-floor neighbor and Clemente's former girlfriend, Dania Martinez. Although defendant was still present at the party when Clemente arrived in the early morning hours of April 9, he had not been continuously present there. At one point, he had left the party with Altagracia Martinez to purchase beer. In addition, as he himself testified, he had left Dania's party "many times" to monitor the progress of some beans that he was cooking in his downstairs apartment.

After defendant finished cooking the beans, he brought them upstairs to Dania's apartment; and he also brought individual serving cups for each person at the party. Later, he spent time "talking, joking, and playing music * * * dancing by myself and singing." The defendant testified that Clemente and another man arrived at the party "about 2:45 in the morning" and that the reason he remembered that particular time was "because I watch my watch."

Shortly thereafter, defendant decided to leave the party. Before he left, however, defendant told Dania's sister, Altagracia, that he "was going to call a cab to take her home." He offered to make the telephone call because he believed her to be drunk and incapable of driving herself.

After defendant went downstairs to his apartment, he placed a telephone call to a taxicab company. When the taxi arrived outside the apartment building, defendant placed a telephone call to Dania's apartment to inform Altagracia of its arrival. Dania answered and encouraged defendant to return to the party. At first, defendant was hesitant because "I knew this guy [Clemente] * * * was violent." In the end, however, Dania successfully persuaded him to return to the party.

When he returned to Dania's apartment, defendant knocked on the door and Dania answered. Dania directed him to sit in a chair while she went to the kitchen to get a beer for him. Shortly thereafter, defendant and Dania began to dance. While they were dancing, laughing and talking, Clemente approached them and began to argue with Dania. Later, Clemente and his friend approached defendant while he was sitting by himself. The defendant testified that he felt threatened by the two men, and he pulled out his gun and cocked it. A scuffle broke out between defendant and Clemente, which ultimately culminated in the shooting that has been described in greater detail earlier in this opinion.

After Clemente was shot, defendant immediately fled from the scene and ran into a nearby yard. He testified that, as he was running, he separated the magazine from the gun and then threw the gun away. When he emerged from the yard, defendant hailed a passing taxi, stepped into the vehicle, and told the driver to take him to the nearest hotel. During the taxi ride, defendant rolled down the window and threw away the magazine that he had previously separated from the gun.[12] Thereafter, defendant rented a room at a motel and slept there until about ten o'clock in the morning. He testified that "When I woke up that's—I remember everything, then I called my sister."

12. The police never recovered either the gun or the magazine.

In denying defendant's request for an instruction on manslaughter by reason of diminished capacity, the trial justice noted that "mere intoxication is not enough to rise to the level that would invite a diminished capacity jury instruction." He then held that: "There is a complete lack of substantial evidence in the record before me that in any way rises to the level that would give the defendant the opportunity to argue for a jury instruction relating to diminished capacity." On the basis of our review of the record, with particular attention being given to the above-summarized factual examples of behavior by defendant that strongly militate against a finding of diminished capacity, we concur with the conclusion reached by the trial justice.

The defendant failed to produce even the minimal evidence required to warrant an instruction on diminished-capacity manslaughter. The defendant's actions, including his deliberate efforts to conceal his involvement in the crime while he was fleeing from the scene, coupled with his detailed memory of several events that occurred throughout the period in question, contradict his assertion that his will was so paralyzed as to render him incapable of withstanding evil impulses or forming any sane design. *See Vanasse,* 42 R.I. at 281, 107 A. at 86; *see also Johnson,* 667 A.2d at 528–29. Consequently, we conclude that the trial justice properly refused to instruct the jury on manslaughter by reason of diminished capacity.

### Conclusion

For the reasons stated, the conviction entered in the Superior Court is hereby affirmed. The papers in the case may be remanded to the Superior Court.