STATE

v.

**Jeremy M. MOTYKA.**

No. 2002–403–C.A.

Supreme Court of Rhode Island.

March 21, 2006.

Lauren Sandler Zurier, Esq., Providence, for Plaintiff.

Paula Rosin, Esq., Providence, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, and ROBINSON, JJ.

## OPINION

Justice ROBINSON for the Court.

The defendant, Jeremy M. Motyka, appeals from a jury verdict finding him guilty of the first-degree murder of and first-degree sexual assault upon Angela Spence–Shaw. After he was convicted, the defendant was sentenced to life imprisonment without the possibility of parole on the murder charge and to a concurrent life sentence on the sexual assault charge.

On appeal, defendant challenges various rulings of the trial justice. First, defendant contends that the trial justice erred when she made pretrial discovery rulings which precluded defendant from obtaining certain information related to the DNA testing that had been conducted by a private laboratory and which conditioned the prosecution's duty to disclose other DNA-related information on a reciprocal duty that would require defendant to disclose to the prosecution the identity of the DNA expert who was serving as a consultant to the defense. Second, defendant argues that the trial justice abused her discretion when she refused to allow the defense to explore certain areas on cross-examination on the grounds that such questioning would go beyond the scope of the direct examination of the witness. Third, defendant argues that the trial justice erred in refusing to instruct the jury on the lesser-included offense of voluntary manslaughter due to diminished capacity. Fourth, defendant contends that a sentence of life imprisonment without the possibility of parole was not warranted in this case.

For the reasons set forth herein, we affirm both the judgment of conviction and the sentence of life imprisonment without the possibility of parole.

## Facts and Travel

At some point during the early morning hours of Sunday, May 30, 1999,[1] sixty-six-year-old Angela Spence–Shaw was brutally murdered in her Little Compton home. When Ms. Spence–Shaw failed to show up for work later that Sunday morning, a friend, Sally Craig, went to her home to check on her. Upon her arrival, Ms. Craig found Ms. Spence–Shaw's severely beaten and lifeless body lying in the upstairs bathtub. In addition to Ms. Spence–Shaw's body, there was also an electric hairdryer in the bathtub, which Ms. Craig unplugged. It was later determined that, in addition to having been savagely beaten, Ms. Spence–Shaw had also been raped before she died. The medical examiner attributed her death to drowning in the bath water as well as to the substantial blunt force trauma that she had suffered.

Ms. Spence–Shaw's home did not appear to have been ransacked. In fact, both her wallet and the cash that she kept in a ceramic box on her bedroom dresser (amounting to more than $500) remained untouched. Similarly, Ms. Spence–Shaw's jewelry had also been left undisturbed by her attacker. Moreover, there were no signs of forced entry. By contrast, however, in Ms. Spence–Shaw's bedroom, which adjoined the bathroom where her body was discovered, there were numerous indicia of the violent attack that had occurred. There were puddles of blood on both the bed and the floor, and there were bloodstains on the carpet leading into the bathroom. There was also blood on the bed-room furniture and walls, especially on the wall behind the bed and on the wall and doorframe leading into the bathroom. The bed had been moved away from the wall and stripped of linens, and a bloodstained pillow and pillowcase were found on the floor nearby.

When the victim was found, she had on only a pink night shirt, and she was wearing nothing below the waist. According to the testimony of one of the first responders, an emergency medical technician who was an acquaintance of the victim, Ms. Spence–Shaw was so severely beaten that she was unrecognizable. Doctor Elizabeth Laposata, chief medical examiner for the State of Rhode Island, who performed the autopsy on Ms. Spence–Shaw's body, gave similar testimony at trial about the extensive injuries that the victim suffered. Doctor Laposata testified about both the horrific external injuries which were visible on the victim's body and the numerous internal injuries that her assailant inflicted upon her. In addition, Dr. Laposata testified about injuries to the victim's genital area which were consistent with forced sexual intercourse. According to the testimony of Dr. Laposata, those injuries to the genital area were inflicted while Ms. Spence–Shaw was still alive. Doctor Laposata further testified that Ms. Spence–Shaw was still alive when she was placed underwater in the bathtub following her brutal beating and rape. Moreover, Dr. Laposata testified that, given the nature of Ms. Spence–Shaw's injuries, her pathways to perceive pain remained intact throughout the attack, thus allowing her to experience the significant amount of pain that her various injuries would have caused.

During the autopsy, Dr. Laposata used a sexual assault evidence collection kit to

---

1. Based on the condition of Ms. Spence–Shaw's body when it was found and taking into account the contents of her stomach at the time of the autopsy, the Medical Examiner estimated that she died at some point in time between 1 and 3 a.m.

swab the decedent's mouth, vagina, and rectum. The rape kit (including the oral, vaginal, and rectal swabs) was then delivered to the Serology Laboratory within the Rhode Island Department of Health. The Serology Laboratory determined that seminal fluid and sperm cells were present in both the vagina and the rectum of the decedent.

At the time of her murder, Ms. Spence–Shaw was in the process of renovating her home. On Friday, May 28, 1999, just two days before her vicious slaying, a construction crew had broken through a wall of her house as part of the process of connecting an addition to the existing house; this left her home temporarily unsecured. Anyone who knew about that temporary opening in the wall of the house could have easily entered Ms. Spence–Shaw's home. The defendant, a carpenter, was part of the three-man crew which had broken through the wall of Ms. Spence–Shaw's home on May 28.

At the time of Ms. Spence–Shaw's murder, defendant had been living in Fall River, Massachusetts, with his girlfriend, Patricia Rogalin, their young son, and other members of Ms. Rogalin's family. Ms. Rogalin testified at trial that on Friday, May 28, she had traveled to Falmouth on Cape Cod with her son and the other family members who lived with them in order to spend Memorial Day weekend with her parents. The defendant remained alone in the Fall River home, telling Ms. Rogalin that he did not want to go to Cape Cod because of the holiday traffic.[2]

According to Ms. Rogalin's testimony, after defendant arrived home from work on Saturday, May 29, she spoke with him by telephone numerous times. She testified that these conversations began in the late afternoon and continued intermittently throughout the evening, with their last phone conversation ending around 9:30 or 10:00 p.m.[3] Ms. Rogalin further testified that she and defendant argued throughout these phone calls and that his demeanor was very hostile. Moreover, it appeared to Ms. Rogalin that defendant had been drinking, although she testified that he spoke coherently enough for her to be able to understand what he was saying.

At trial, Kelly Stokes, a seventeen-year-old neighbor of defendant and Ms. Rogalin in Fall River, testified that on that Saturday night defendant was in a neighbor's yard socializing with her and some of her friends until about 1:00 or 1:30 a.m. Ms. Stokes testified that defendant was drinking rum and beer, which he shared with the teenagers. She also testified that, before defendant arrived, she and her friends had been smoking marijuana and that defendant asked them whether they had any more of the drug, which they did not. She testified that one of her friends and defendant then made some phone calls to try to acquire some more marijuana. Ms. Stokes further testified that, as she was walking home after the gathering in the yard had broken up, defendant asked her to go with him, but she declined.

On Sunday morning, May 30, at approximately 8:30 a.m., defendant called Ms. Rogalin and unexpectedly announced that he

2. Although Ms. Rogalin testified that defendant told her that he wanted to avoid the holiday traffic in the Cape Cod area, she also acknowledged that he was scheduled to work on both Friday (May 28) and Saturday (May 29), and she indicated that those commitments constituted an additional reason for his staying behind in Fall River.

3. According to a stipulation between the state and the defense as to telephone calls for defendant's address, the last phone call between defendant and Ms. Rogalin actually ended around 10:30 p.m.

would be driving down to Cape Cod. According to Ms. Rogalin's testimony, when defendant arrived in Falmouth between 9:30 and 10:00 a.m., he vomited and then proceeded to remain in bed all day sleeping. Ms. Rogalin further testified that defendant told her that he had stayed home all Saturday night drinking.

The defendant and Ms. Rogalin left Falmouth for Fall River around 8:30 the next morning. Soon after the couple had returned home, the Rhode Island State Police arrived at their home to inform defendant that they were investigating the homicide of Ms. Spence–Shaw and to inquire about his whereabouts on May 29 and 30. According to the testimony of Detective Sergeant Stephen Bannon, a member of the State Police Major Crimes Unit who had been assigned to work on the investigation of Angela Spence–Shaw's murder, defendant told the police that he had worked on Saturday until about 3 p.m. and then had gone home, where he drank beer. The defendant told the police that he had remained home all night, leaving only to socialize with some teenagers at a neighbor's house until about midnight. The defendant also told the police that, after leaving the teenagers, he called Chris Taylor, his friend and former coworker, before falling asleep for the night. According to the testimony of Ms. Rogalin, the police also questioned her about her whereabouts during the course of the weekend. Ms. Rogalin further testified that, after the police left, defendant appeared to be very interested in what she had said to them.

Just a few days later, on June 3, Detective Bannon went to the job site where defendant was working to question him for a second time. According to the testimony of Detective Bannon, defendant at that time provided him with information that was somewhat inconsistent with what he had said at his home in Fall River on May 31. Detective Bannon testified that defendant stated during the June 3 interview that he had gone to a bar after work on May 29 and that he had remained there until approximately 6 p.m. The defendant also told Detective Bannon on June 3 that on the night in question he had spoken with Ms. Rogalin on the telephone more than once (a statement which is at variance with what he had said during the May 31 interview), that he had ordered a pizza to be delivered from Domino's, and that he had called another friend in addition to Chris Taylor. The defendant also acknowledged to Detective Bannon that the purpose of his phone call to Chris Taylor on Saturday night, May 29, was to obtain marijuana. The defendant continued to maintain, however, that he was at home sleeping between the hours of 12:00 a.m. and 8:30 a.m. on Sunday, May 30.

Also on June 3, defendant made an out-of-the-ordinary request of Ms. Rogalin: he asked her to bring the Docksider shoes that he customarily wore at home to Cape Cod.[4] When Ms. Rogalin asked defendant the reason for his unusual request, he refused to tell her. During his trial testimony, however, defendant admitted that the reason for the request was that two days earlier, on June 1, he and the other construction workers present at Ms. Spence–Shaw's house had noticed a box marked "Rhode Island State Police" that appeared to contain a foot impression. Ms. Rogalin complied with defendant's request and brought the shoes to Cape Cod.[5]

4. According to the testimony of Ms. Rogalin, defendant had never before asked her to take shoes or clothing to Cape Cod for him. She also testified that defendant had not been planning to visit Cape Cod on or about June 3.

5. Although Ms. Rogalin brought the shoes to Cape Cod as defendant requested, she later

Only two days later, on June 5, defendant, along with the other construction workers who had worked at Ms. Spence–Shaw's home, gave footprint impressions to the police.[6]

Kevin Choquette, a coworker of defendant's who had also worked on the addition to Ms. Spence–Shaw's house, testified that at some point during this period, after a police visit to the job site, defendant told him of his concern that the police might try to "pin" Ms. Spence–Shaw's murder on him because he had been in trouble with the law in the past. According to Mr. Choquette's testimony, he tried to reassure defendant, who was near tears, that defendant had nothing to worry about because he had never been in Ms. Spence–Shaw's second-floor bathroom or bedroom. In response to this, defendant told Mr. Choquette that he had in fact used Ms. Spence–Shaw's upstairs bathroom on occasion and had wet his hair under the faucet.

However, Mr. Choquette also testified that, during the three months or so that they were working together at Ms. Spence–Shaw's home, he had never seen defendant in the victim's bedroom or bathroom and that prior to this conversation defendant had never mentioned that he had used the upstairs bathroom.

A number of people, including the members of the construction crew who had worked on Ms. Spence–Shaw's home, were asked by the police to give blood samples so that DNA testing could be conducted.[7] On June 9, defendant went to St. Anne's Hospital in Fall River and voluntarily provided the Rhode Island State Police with a blood sample. Robin Smith, the supervisor in the Rhode Island Department of Health's Division of Forensic Biology, testified that she conducted DNA tests on twenty-three blood samples that were submitted by the State Police.[8] According to

---

returned them to Fall River and left them in a bag in the toy room of the apartment that she shared with defendant. She told the police about the shoes on June 24, when they came to her home to speak with her and to execute a search warrant. During their search of the apartment, the police found the shoes hidden behind a dresser in one of the bedrooms. According to the testimony of Ms. Rogalin, it was not she who had hidden the shoes behind the dresser.

6. The footprints found at Ms. Spence–Shaw's home were later matched, not to defendant's footwear, but to the footwear of David Peckham and Kevin Choquette, the other construction workers who had given footprint impressions to the police. This information was of limited relevance, however, since no footprints were recovered from either Ms. Spence–Shaw's bedroom or the adjoining bathroom where her body was discovered.

7. A comprehensive discussion of the admissibility of DNA evidence and the science behind DNA testing is contained in this Court's decision in *State v. Morel*, 676 A.2d 1347 (R.I. 1996). In that case, we described how each DNA molecule is composed of a sequence of base pairs and how this particular arrange-

ment of base pairs is what determines a person's genetic code. *Id.* at 1350. Most of the base pairs are arranged in the same sequence in all humans, but each DNA molecule has polymorphic loci—i.e., locations where an allele (an alternative form of a gene at a given locus) differs among individuals. *Id.* These variations are what make each person unique. *Id.* Forensic DNA typing looks at locations on the DNA molecule that are polymorphic and "compares 'evidentiary DNA' (DNA recovered from a crime scene) with 'suspect DNA' (DNA extracted from the blood of a suspect)." *Id.* at 1350–51. As we noted in *Morel*, "[t]he declaration of a match signifies only that the DNA profile of the suspect is consistent with that of the source of the crime sample." *Id.* at 1352. The statistical likelihood that there is someone else in the population who has the same DNA profile as the suspect and the DNA recovered from the crime scene is then calculated. *Id.*

8. According to Ms. Smith's testimony, the type of DNA analysis that she undertook in this case was polymerase chain reaction ("PCR") DNA analysis using a testing kit which allowed her to analyze six different loci on the DNA molecules. Ms. Smith further

the testimony of Ms. Smith, she had previously conducted DNA testing on the vaginal and rectal swabs collected from the victim; she then compared the results of that testing with both a known sample of Ms. Spence–Shaw's blood and with the known blood samples that she had received from the State Police. Robin Smith further testified that, as a result of this DNA testing, she was able to exclude twenty-two of the twenty-three persons who had provided blood samples to the police from being the donor of the DNA found on the vaginal swab taken from Ms. Spence–Shaw. She testified that the only person whom she was not able to exclude was defendant.

In addition, Ms. Smith testified about the statistical probability of randomly selecting an unrelated person who has the same genetic profile as both defendant and the sperm fraction DNA found in the victim's vagina: for Caucasians in the United States, the number of people who are statistically expected to have the same set of six genotypes [9] as the defendant and the sperm fraction found on the vaginal swab would be one in 36,041; for African Americans in the United States, it would be one in 53,132; and for Southeast Hispanics in the United States, it would be one in 27,-201.

After Ms. Smith's DNA testing had been concluded, defendant was arrested on June 24. At that time, he was brought to the Little Compton Police Department, where he was interrogated by Detective Bannon and by Detective Corporal Nicholas Tella (a member of the State Police Major Crimes Unit assigned to work on the investigation of Angela Spence–Shaw's murder). During the course of this interrogation, defendant gave the police a statement regarding his whereabouts on Saturday, May 29, which statement was similar to what he had told Detective Bannon during the June 3 interview.[10] He said that he had gone to a bar after work, where he remained until about six o'clock, and that he had then gone home, where he ordered a pizza to be delivered from Domino's and talked on the telephone with his girlfriend and some friends. The defendant also told the police that, once he arrived at his home from the bar that evening, he consumed about ten twelve-ounce beers and some rum. According to defendant's statement to the police, he stayed at home all night, except for the period when he went next door to talk with some teenage neighbors from about 10:30 p.m. until about 1:30 a.m. The defendant denied leaving the area of his home during the evening of May 29 or the early morning hours of May 30 and traveling to Ms. Spence–Shaw's home. Moreover, defendant continued to deny throughout the interrogation that he had sexually assaulted and murdered Ms. Spence–Shaw.

When the detectives asked defendant to explain why his semen was found in Ms. Spence–Shaw's vagina, defendant told them that he and his girlfriend would often have sexual intercourse in the morning before he went to work and that he would later clean himself in Ms. Spence–Shaw's bathtub. Ms. Rogalin testified at trial, however, that during the relevant time

---

testified that a person is excluded as a source of the DNA found in the victim's vagina and rectum if she finds a difference in DNA types at any one of the six loci that she is analyzing.

9. According to the testimony of Ms. Smith, genotypes are the combinations of alleles at a particular location on a DNA molecule.

10. Following his arrest, defendant gave two tape-recorded statements to the police. These tapes were played for the jury during the trial, and transcripts of the recordings were received as full exhibits.

period she and defendant never had sexual intercourse in the morning before he went to work; she said that they had sexual intercourse only at night, after which defendant would always wash any seminal fluid off himself with their son's baby wipes. Moreover, Dr. Laposata testified at trial that the vagina is a "closed, protected space" and that, therefore, she would not expect that there would be any seepage or leakage of material from the tub water into the vaginal cavity.

At trial, defendant gave an account of his activities on the night in question that was substantially identical to the statement that he had given to the police following his arrest on June 24. The defendant testified that he was certain that he had not left his house, traveled to the home of Ms. Spence–Shaw, and sexually assaulted and murdered her during either the evening hours of May 29 or the early morning hours of May 30. The defendant did admit, however, that he had lied to the police about having sexual intercourse with his girlfriend before going to work in the morning. The defendant also admitted that he was familiar with the floor plan of Ms. Spence–Shaw's home and knew how to get up to her bedroom from the opening in the wall that he and the other construction workers had created as part of the process of connecting the addition that they were building.

At trial, defendant did not dispute that the semen found on the vaginal swab was his. Rather, defendant contended that the semen on the vaginal swab had not actually been found in Ms. Spence–Shaw's vagina, but rather had been planted on the swab by a third party. The defendant testified at trial that, in addition to providing the State Police with a blood sample,

he had also provided them with a semen sample. According to defendant's testimony, after his blood was drawn at St. Anne's Hospital on June 9, he was asked by Detective Tella, who had accompanied defendant into the hospital, to provide him with a semen sample. The defendant testified that, after leaving the hospital, he joined Detective Tella in the detective's vehicle. The defendant further testified that Detective Tella told him that he was a "prime suspect," that this was the time to help himself out, and that he should let Detective Tella help him. According to defendant's testimony, Detective Tella told him that semen had been found at the crime scene and that there were differences between the testing of semen and the testing of blood; he said that Detective Tella then requested that defendant provide him with a semen sample. The defendant further testified that Detective Tella furnished him with a cup and a pornographic magazine and that he then went into his own car in the St. Anne's Hospital parking lot and produced a semen sample, which he gave to Detective Tella.

During his testimony, Detective Tella denied that this conversation had taken place, and he also denied that he had asked defendant to provide a semen sample. Detective Tella further testified that, in his eleven years with the State Police, he had never taken a semen sample from anyone or seen another detective take one. Moreover, in defendant's post-arrest statement to the police, he never mentioned anything about the semen sample, even though the police questioned him multiple times about how it happened that his semen had been found in Ms. Spence–Shaw's vagina.[11]

11. The defendant testified at trial that he did mention the semen sample when he was being interrogated by the police on June 24, but that he did so while Detective Bannon was out of the room and only Detective Tella was present. According to defendant's testimony,

According to the testimony of Lieutenant William Labossiere, the officer in charge of the Rhode Island State Police Criminal Identification Unit, a second blood sample was taken from defendant on July 6, while he was being held at the Adult Correctional Institutions. Lieutenant Labossiere testified that he then took this blood sample, along with the vaginal and rectal swabs obtained from the body of Ms. Spence–Shaw and the known sample of Ms. Spence–Shaw's blood, to the offices of Bode Technology Group ("Bode"), a private biotechnology laboratory in Springfield, Virginia that specializes in DNA testing and identification.[12]

Lisa Barnes and Suzanna Ulery, two forensic case analysts employed by Bode at the time of the investigation of Ms. Spence–Shaw's murder, conducted DNA testing on the evidence that was submitted to Bode in connection with this case. Ms. Barnes testified that, based upon the tests that she conducted, she was not able to exclude defendant from being a possible donor of the sperm fraction on the vaginal swab at any of the eight locations that she analyzed on the DNA molecules. Ms. Ulery similarly testified that, based upon the tests that she conducted, she was also unable to exclude defendant from being a possible donor of the sperm fraction on the

vaginal swab—because he was a match at every location she tested.

According to the testimony of Ms. Ulery, as well as the testimony of Dr. Kevin McElfresh, senior vice president of operations and laboratory director for Bode and the person who supervised the work of Ms. Barnes and Ms. Ulery in this case,[13] a statistical analysis was performed to determine the probability of randomly selecting an unrelated individual with the same DNA profile as defendant's and that of the sperm fraction found on the vaginal swab obtained from the victim. According to this statistical analysis, the probability in the Caucasian population was "one in $1.77 \times 10^{18}$"; the probability in the African–American population was "one in $4.25 \times 10^{19}$"; and the probability in the Hispanic population was "one in $2.15 \times 10^{20}$." Doctor McElfresh testified at trial that "[b]ased on the size of this number, and the results in this case, it is logical—scientifically logical—and reasonable that the DNA from the vaginal swab, sperm fraction, and the DNA from Mr. Motyka are, in fact, from the same person."

On April 27, 2000, defendant filed a discovery motion, entitled "Defendant's Second Motion for Discovery of DNA Information and Materials Relating to STR Testing Performed by the Bode Technolo-

---

when he brought up the subject of the semen sample while Detective Bannon was out of the room, Detective Tella told him "[D]on't even try to go there." The defendant admitted, however, that he did not make any reference to the semen sample during the tape-recorded statement that he provided on June 24.

Furthermore, Robin Smith testified at trial that it was on June 3 that the Department of Health began conducting DNA tests on the vaginal and rectal swabs collected from the victim. This was six days before the June 9 date on which defendant alleged he provided Detective Tella with a semen sample in the parking lot of St. Anne's Hospital in Fall River.

**12.** Robin Smith testified at a pretrial hearing that she recommended that the DNA evidence in this case be sent to Bode for further testing because she considered the type of testing conducted by that laboratory (viz., short tandem repeat ("STR") PCR DNA analysis) to be "more discriminating." Additionally, the testing kits used by Bode allowed more genetic locations to be analyzed than the testing kit used by Ms. Smith.

**13.** Doctor McElfresh had previously served as an expert witness in various jurisdictions approximately 450 times. His expertise is in the subjects of (1) DNA analysis, (2) PCR STR testing, and (3) population genetics.

gy Group," which requested that the Superior Court order the state to produce certain information and materials related to the DNA testing performed by Bode in this case. The defendant obtained much of the requested information and materials as a result of both the state's voluntary compliance and the court's having granted some portions of defendant's motion to compel discovery. The trial justice did, however, deny defendant's discovery motion with respect to some of the information that he had sought. Specifically, the trial justice denied defendant's request for all documentation regarding the computer software used by Bode in its DNA analysis, "including any user's manual, package inserts, protocols, revised protocols, technical manuals, manufacturer revisions and updates to protocols, calibration standards, and service contract agreements." At the hearing on defendant's discovery motion, the trial justice determined that said information was not "within the possession, custody or control of the State" and thus was not discoverable by defendant under Rule 16 of the Superior Court Rules of Criminal Procedure. Moreover, the trial justice ruled that the information concerning the referenced software did not fall within the scope of Rule 16(a)(5).

The trial justice also limited the access that defendant and his DNA expert[14] could have to information regarding the fluorescent scanner and the thermocycler used by Bode in this case. The state had provided defendant with Bode's protocols about said equipment, but it refused to provide the user manuals or any other information from the manufacturer, asserting that these materials were copyrighted. At the pretrial hearing on defendant's motion, the trial justice accepted the state's position with regard to the user manuals and ruled that defendant's expert could have access to this information only if defendant agreed to certain precautions designed to protect this commercially valuable information. The judge ordered that defendant's DNA expert could review the user manuals only if the defense (1) disclosed to the court and the prosecution the identity of said expert and (2) had that expert either review the materials at the laboratory or agree to a protective order which would prevent the information from being disseminated. The court order noted defendant's objection to the requirement that the identity of his expert be disclosed to both the court and the prosecutor. The trial justice rejected the defense counsel's proposed alternatives for obtaining the desired information without having to disclose the identity of the defense expert.[15] The defendant then filed a petition for writ of certiorari with this Court seeking review of the trial justice's discovery ruling, but that petition was denied.

On May 4, 2000, defendant filed a motion *in limine* requesting that a pretrial evidentiary hearing be held to determine the reliability, relevancy, and admissibility

14. It appears that defense counsel had retained an expert in the field of DNA analysis for purposes of consultation and advice.

15. Defense counsel proposed three alternatives whereby the defendant could obtain the desired information without having to disclose the identity of the defense expert. The first alternative was for the defense expert to sign and acknowledge the protective order *in camera, ex parte,* and under seal. The second alternative was for defendant's attorney to certify to the court under oath that he had provided a copy of and explained the protective order to the defense expert and that said expert understood and agreed to abide by its provisions. The third alternative provided that, if the defense expert agreed to disclose his or her identity, the state would agree not to call the expert as a witness at trial. The trial justice rejected each of these proposed alternatives.

of the DNA evidence and seeking an order prohibiting the state from making any reference to DNA evidence in this case. In support of this motion, defendant argued that, although this Court had previously approved of the use of restriction fragment length polymorphism ("RFLP") DNA testing, it had never approved PCR DNA analysis.[16] The defendant also argued that the court should exclude evidence of the DNA analysis performed by Bode due to the fact that (according to defendant) the trial justice's pretrial discovery rulings, by denying defendant access to critical information relating to this analysis, had made it impossible for defendant to adequately cross-examine the Bode witnesses.

On January 23, 2001, after a pretrial hearing which lasted several days, the trial justice issued a written decision denying defendant's motion *in limine* and holding that the DNA evidence at issue in this case was admissible.[17] Although the trial justice did note that the use of PCR testing and its results was "one scientific issue that our Supreme Court has not yet specifically addressed," she nevertheless found that PCR testing is "not new in the scientific world or in trial usage."[18] After considering the state's evidence regarding the reliability of PCR testing and its acceptance in the scientific community, the trial justice found that the defendant had failed to raise a sufficient challenge to this evidence. The trial justice went on to apply the three-prong analysis set out in *State v. Wheeler*, 496 A.2d 1382, 1388 (R.I.1985), and applied in *State v. Morel*, 676 A.2d 1347, 1354–55 (R.I.1996), for analyzing the admissibility of expert testimony based upon novel scientific evidence.[19] The trial justice found (1) that the DNA evidence

16. The RFLP method of DNA testing is discussed at length in *Morel*, 676 A.2d at 1351–52. As the trial justice noted, this Court has expressed its approval of the use of the RFLP testing method. *See generally id.*

17. In this decision, the trial justice also denied defendant's motion to suppress any alleged confession and/or statement made to the Rhode Island State Police on May 31, June 3, or June 24, 1999. After considering all of the evidence before the court, the trial justice found that all of the challenged statements were made without violation of defendant's constitutional rights.

18. In support of this finding, the trial justice cited a National Research Council publication which stated that by 1996 (when that document was published) PCR testing had already been used in forty-four cases and had been evaluated in twenty-five admissibility hearings in twenty different states. The trial justice also made reference to additional jurisdictions which had accepted PCR testing. She specifically mentioned (*inter alia*) an opinion of the United States Court of Appeals for the Eighth Circuit, *United States v. Beasley*, 102 F.3d 1440, 1448 (8th Cir.1996), which took judicial notice of the reliability of that method of testing.

19. The trial justice noted her skepticism as to whether conducting such an analysis or even a pretrial hearing was still required in DNA cases:

"Because DNA science is no longer new or novel, and absent some objective pretrial suggestion of an expert qualification problem, or scientific testing methodology error or ineptitude, or some other flaw in the offered evidence, this Court believes, at present, that our case law does not mandate a lengthy preliminary hearing to determine the possible use or exclusion of otherwise ordinary scientific evidence. Rather, if the problems flagged by *Morel*, as noted above, are able to be sufficiently explored on cross-examination, then the issue becomes one of the weight of the evidence rather than its admissibility."

However, "out of an abundance of caution" and because this case involves a particular scientific issue which this Supreme Court had not specifically addressed as of that time (namely, the PCR method of DNA testing), the trial justice conducted a hearing with respect to defendant's motion *in limine* and applied the three-prong test.

was relevant, (2) that the subject matter was one for which expert testimony was appropriate and that the experts who would testify in this case were qualified to render an opinion, and (3) that the DNA evidence would be helpful to the trier of fact. Accordingly, defendant's motion *in limine* was denied.

A jury trial commenced in the Superior Court for Newport County on January 23, 2001, at the conclusion of which defendant was found guilty of the first-degree murder of and first-degree sexual assault upon Ms. Spence–Shaw. The jury thereafter found that defendant had committed the murder intentionally while engaged in the commission of first-degree sexual assault and that the murder was committed in a manner involving torture and aggravated battery. On April 27, 2001, defendant was sentenced to life imprisonment without the possibility of parole on the murder charge.[20] In addition, he was sentenced to a concurrent life sentence on the sexual assault charge.

On appeal to this Court, defendant challenges numerous rulings made by the trial justice. First, defendant argues that the trial justice erred in that portion of her pretrial discovery rulings which precluded defendant from obtaining the software package used by Bode in this case and conditioned the prosecution's duty to produce the user manuals for the fluorescent scanner and the thermocycler to defendant on a reciprocal duty that would require defendant to disclose the identity of the DNA expert who was serving as a consultant to the defense. Second, defendant contends that it was an abuse of discretion

for the trial justice to refuse to allow defendant to explore certain areas on cross-examination of a particular witness for the reason that (in the trial justice's estimation) such questioning would go beyond the scope of the direct examination of the witness. Third, defendant contends that the trial justice erred in refusing to instruct the jury on the lesser-included offense of voluntary manslaughter due to diminished capacity. Fourth, defendant argues that a sentence of life imprisonment without parole was not warranted in this case.

## Standard of Review

■ The standard of review applicable to a trial justice's determination as to whether or not a defendant was entitled to discover certain evidence pursuant to Rule 16 of the Superior Court Rules of Criminal Procedure is a narrow one: a trial justice's ruling in this regard will be overturned on appeal only if it was clearly erroneous. *See State v. Briggs*, 886 A.2d 735, 755 (R.I.2005) ("When we review a determination of whether a violation of Rule 16 * * * occurred, the applicable standard is narrow: the trial justice must have committed clear error.").

■ A trial justice's determination as to the permissible scope of cross-examination is also given deference and will be disturbed on appeal only upon a clear showing of abuse of discretion and only if it constitutes prejudicial error. *See State v. Jimenez*, 882 A.2d 549, 552 (R.I.2005) ("This Court reviews evidentiary rulings concerning the scope and extent of cross-examination only for abuse of discretion

**20.** General Laws 1956 § 11–23–2 allows the court to impose a sentence of life imprisonment without the possibility of parole in first-degree murder cases when one of seven enumerated grounds is present. Among these grounds is the situation in which the first-degree murder is "committed intentionally

while engaged in the commission of another capital offense or other felony for which life imprisonment may be imposed" or when the first-degree murder is "committed in a manner involving torture or an aggravated battery to the victim."

and only when the ruling has caused prejudice to the moving party."); *State v. Gordon*, 880 A.2d 825, 838 (R.I.2005) ("A trial justice's determination as to the permissible scope of cross-examination is discretionary and will not be disturbed by this Court unless that discretion was clearly abused and constituted prejudicial error."); *State v. Benevides*, 420 A.2d 65, 69 (R.I. 1980) ("[T]he permissible scope and extent of cross-examination rests in the sound discretion of the trial justice, * * * and his rulings thereon will only be reviewed for an abuse of discretion.").

■ By contrast, a trial justice's refusal to instruct the jury on a lesser-included offense is reviewed by this Court on a *de novo* basis. *State v. Garcia*, 883 A.2d 1131, 1137 (R.I.2005). In deciding whether or not a trial justice erred in refusing to instruct the jury on a lesser-included offense, this Court will examine the record in the case and determine whether the evidence justifies such an instruction. *Id.* ("In determining whether the refusal to instruct on a lesser-included offense was proper, this Court examines the record to determine whether adequate evidence was introduced to merit a jury instruction on the lesser-included offense."); *see also State v. Rodriguez*, 822 A.2d 894, 910 (R.I. 2003) ("[W]hen a defendant challenges the trial justice's refusal to give a jury instruction on a lesser-included offense, this Court will examine the record to determine whether the evidence warranted a jury charge on the lesser-included offense * * *."). In undertaking this *de novo* review, the role of this Court is limited to "ascertaining whether 'an actual and adequate dispute exists as to the distinguishing element between the lesser and greater offenses in question.'" *Garcia*, 883 A.2d at 1137 (quoting *State v. Froais*, 653 A.2d 735, 737 (R.I.1995)). If no such dispute exists, our inquiry must end. *Id.*

■ Similarly, the decision to impose a sentence of life imprisonment without the possibility of parole is also reviewed by this Court in a *de novo* manner. *See State v. Harnois*, 853 A.2d 1249, 1257 (R.I.2004); *State v. Tassone*, 749 A.2d 1112, 1119 (R.I. 2000); *State v. Travis*, 568 A.2d 316, 325 (R.I.1990). It is well settled that, in cases involving the imposition of a sentence of life without parole, "it is incumbent upon this Court to exercise its own independent judgment and discretion in determining the appropriateness of the sentence." *Tassone*, 749 A.2d at 1119. In determining whether such a sentence was proper, "this Court shall examine the record, the findings of the trial justice, and the personal character, record, and propensities of the defendant." *Id.*

## Analysis

### I

### The Discovery Issue

On appeal, defendant challenges two pretrial discovery rulings made by the trial justice. The first of these pretrial rulings precluded defendant from obtaining the software package that the Bode laboratory used in this case as it performed the DNA testing and analyzed the results of that testing. The second pretrial ruling challenged by defendant conditioned the production to defendant of the user manuals for certain equipment used in Bode's DNA testing on the disclosure by the defense of the identity of the DNA expert with whom it was consulting. The defendant argues that, by making these discovery rulings, the trial court violated the work product privilege, as well as defendant's constitutional rights to due process and to the effective assistance of counsel. The defendant also contends that, because of these discovery rulings, the trial court ultimately erred in ruling that the DNA analysis

performed by Bode in this case was admissible at trial. The essence of defendant's argument appears to be that, because he was denied access to the software and user manuals of the equipment used by Bode in connection with its DNA analysis, defense counsel was not adequately equipped to cross-examine the relevant prosecution witnesses and to challenge the reliability of the state's DNA evidence.

◼ The defendant argues that the software package and the user manuals for the fluorescent scanner and thermocycler that he sought from the state in this case were discoverable under Rule 16(a)(5). That rule permits discovery by a defendant of the following items:

> "all results or reports in writing, or copies thereof, of physical or mental examinations, and of scientific tests or experiments made in connection with the particular case and, subject to an appropriate protective order * * *, any tangible objects still in existence that were the subject of such tests or experiments." *Id.*

This rule only applies, however, to "items within the possession, custody, or control of the State." Rule 16(a). This Court has unequivocally held that Rule 16(a) does not entitle defendants to discovery of materials that are controlled by third parties. *State v. Juarez,* 570 A.2d 1118, 1120 (R.I.1990) ("[A] right to disclosure of materials that are controlled by third parties does not arise pursuant to Rule 16(a)."); *see also State v. Waite,* 484 A.2d 887, 891 (R.I. 1984).

In the present case, the software package and the user manual for the fluorescent scanner that defendant sought clearly were not "within the possession, custody, or control of the State" as required by Rule 16(a). Instead, these materials were in the sole possession, custody, and control of a third party—namely, Bode, a private

laboratory. Accordingly, defendant was not entitled to discovery of these materials under Rule 16(a). *See Juarez,* 570 A.2d at 1120.

◼ With regard to the user manual for the thermocycler, it appears that, by the time the pre-trial discovery order was entered in this case, this material was also in the possession of the Rhode Island Department of Health. In order to determine whether or not the user manual thereby fell "within the possession, custody, or control of the State" so as to meet the general prerequisite for discoverability under Rule 16(a), we would have to determine precisely which governmental entities constitute "the State" for Rule 16(a) purposes. We need not pass upon that issue in the present case, however, because, even if we determined that the user manual was "within the possession, custody, or control of the State," the user manual still would not fall within the purview of Rule 16(a)(5). A user manual certainly does not constitute "results or reports * * * of scientific tests or experiments"—which are the items that are made discoverable pursuant to subsection (5) of Rule 16(a).

◼ Since defendant was not entitled to discovery of the software or user manuals under Rule 16(a)(5), the trial justice's pretrial discovery ruling precluding defendant from obtaining the software package was certainly not "clearly erroneous." *See Briggs,* 886 A.2d at 755. Moreover, given that defendant was not entitled to discovery of these materials, it is not necessary for this Court to pass upon the decision of the trial justice to condition the discovery of the user manuals on the disclosure by the defense of the identity of the DNA expert with whom the defense was consulting or to address defendant's argument that this ruling by the trial justice violated the work product privilege and defendant's

constitutional right to the effective assistance of counsel.

Although we need not reach defendant's other discovery arguments, we wish nevertheless to comment briefly on defendant's argument that the trial court erred in admitting evidence of the DNA analysis performed by Bode because defendant was not adequately equipped to cross-examine the relevant witnesses and to challenge the reliability of this evidence due to the fact that he was denied access to these few materials. While we recognize that this Court has previously held that the results of DNA analysis should only be presented to the jury "provided a defendant is afforded the opportunity to cross-examine the experts, to question the validity of their conclusions, and to disclose the potential weaknesses of the proffered DNA analyses," *Morel*, 676 A.2d at 1356, it appears that in the present case defendant was afforded each of those opportunities. As defendant concedes in his appellate brief, he obtained some of the information and materials that he requested as a result of both the state's voluntary compliance and the trial justice's granting of some portions of his motion to compel discovery. In fact, the only materials that defendant was not able to obtain were the software package (which the trial justice indicated might be independently available to the defendant, albeit at a high cost) and the user manuals pertaining to the fluorescent scanner and the thermocycler used by Bode (although the state did provide defendant with Bode's protocols regarding this equipment).

In the present case, defendant was provided with a plethora of information relating to the DNA testing and analysis carried out by Bode, and defense counsel extensively cross-examined the relevant witnesses at both the pretrial hearing on defendant's motion *in limine* and at trial.

Thus, we find no merit in defendant's argument that his inability to obtain the few materials that he was unable to obtain through discovery prevented him from adequately challenging the state's DNA evidence. Moreover, the trial justice admitted the DNA evidence in this case only after a lengthy pretrial hearing, at which she considered extensive testimony concerning the reliability of the PCR DNA analysis conducted by Bode and its acceptance in the scientific community. While it is not necessary for us to pass upon the continued necessity of such a pretrial hearing to determine the admissibility of DNA evidence in cases such as this, it is clear that, following such a comprehensive hearing, the trial justice certainly did not err in ruling that the state's DNA evidence was admissible at trial.

## II

### The Cross–Examination Issue

The defendant's second contention on appeal is that the trial justice abused her discretion when she refused to allow defense counsel to explore certain areas during the cross-examination of Detective Tella on the grounds that it would go beyond the scope of the direct examination of the witness. On direct examination by the prosecution, Detective Tella was questioned only about his activities on June 9, 1999, which included the collection and transmittal of blood samples obtained from defendant and certain other persons. On cross-examination, defense counsel sought to question Detective Tella not only about the events of June 9, but also about his participation in the interrogation of defendant on June 24—an area that had not been addressed by the prosecution during direct examination. The trial justice refused to allow defense counsel to pursue this line of inquiry, because it would go

beyond the scope of the direct examination of the witness.

 It is well settled in this jurisdiction that the subject matter of a witness's cross-examination should ordinarily not exceed the scope of the witness's direct examination. *See, e.g., Gordon,* 880 A.2d at 838 ("[C]ross-examination is generally limited to the scope of direct examination * * *."); *State v. Wright,* 817 A.2d 600, 610 (R.I.2003) (holding that, during the cross-examination of a witness, "[i]nquiries * * * that exceed the scope of the direct examination are objectionable"); *Benevides,* 420 A.2d at 69 ("In this jurisdiction cross-examination of a witness is generally limited in scope to matters testified to on direct examination."). This principle is explicitly set forth in Rule 611(b) of the Rhode Island Rules of Evidence, which provides:

> "Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. The court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination."

Although this Court has held that, in some instances, questions which go beyond the scope of direct examination but which are "calculated to explain, contradict or discredit a witness's testimony or designed to test the witness's accuracy, memory, veracity, credibility or bias," *Gordon,* 880 A.2d at 838, are permissible on cross-examination, we have also held that it is well within a trial justice's discretion "to limit cross-examination to that which was addressed on direct examination." *State v. Walsh,* 731 A.2d 696, 698 (R.I.1999); *see also State v. Campbell,* 95 R.I. 370, 376, 187 A.2d 543, 547 (1963) (holding that, in exercising his or her discretion as to the permissible scope of cross-examination, the trial justice is "required to observe the

scope of the examination-in-chief and ordinarily should not permit cross-examination to exceed the reasonable limits set up with respect to direct examination").

After reviewing the record in this case, it is our opinion that the trial justice did not abuse her discretion by limiting the cross-examination of Detective Tella to the scope of the direct examination. *See Walsh,* 731 A.2d at 698; *Campbell,* 95 R.I. at 376, 187 A.2d at 547. There having been no abuse of discretion, we will not disturb on appeal the trial justice's ruling in this regard. *See Jimenez,* 882 A.2d at 552; *Gordon,* 880 A.2d at 838; *Benevides,* 420 A.2d at 69.

### III

### The Lesser–Included Offense Issue

 The defendant's next argument is that the trial justice erred in refusing his request to instruct the jury on the lesser-included offense of voluntary manslaughter due to diminished capacity. We review a trial justice's refusal to instruct the jury with respect to a lesser-included offense on a *de novo* basis. *Garcia,* 883 A.2d at 1137.

 A defendant is entitled to an instruction on a lesser-included offense when such an instruction is justified by the evidence presented at trial. *Jimenez,* 882 A.2d at 554; *Rodriguez,* 822 A.2d at 910; *State v. Hockenhull,* 525 A.2d 926, 930 (R.I.1987). The trial justice should give such an instruction whenever "some minimal evidence exists that, if credited by the jury, could support a conviction for the lesser-included offense." *State v. McGuy,* 841 A.2d 1109, 1112 (R.I.2003); *see also Rodriguez,* 822 A.2d at 910 ("[O]nly a minimum quantum of relevant evidence is necessary for a lesser-included offense to go to the jury * * *."). As we have said, "the court should give such a charge when a party has introduced minimal evidence

that would 'sustain a conviction on a lesser included offense * * *.'" *McGuy,* 841 A.2d at 1112 (quoting *State v. Figueras,* 644 A.2d 291, 295 (R.I.1994)). It is equally clear, however, that a trial justice is not required to instruct the jury on a lesser-included offense when the evidence presented at trial completely fails to support such a charge, *McGuy,* 841 A.2d at 1112, or no dispute exists as to an essential element that distinguishes the lesser and greater offenses in question. *State v. Brown,* 549 A.2d 1373, 1378 (R.I.1988). In determining whether or not there is sufficient evidence to warrant a lesser-included-offense instruction, we have held that the trial justice should not weigh the credibility of the witnesses who have testified at trial. *McGuy,* 841 A.2d at 1112.

It is well settled that "[v]oluntary manslaughter is a lesser-included offense to a charge of murder." *McGuy,* 841 A.2d at 1112. The distinguishing element differentiating murder from voluntary manslaughter is whether or not the act was committed with malice aforethought. *Garcia,* 883 A.2d at 1137; *State v. DePina,* 810 A.2d 768, 778 (R.I.2002); *State v. Amazeen,* 526 A.2d 1268, 1271 (R.I.1987). While murder requires malice aforethought, such malice is "not an element of voluntary manslaughter because mitigating factors * * * negate the defendant's specific intent to kill." *Garcia,* 883 A.2d at 1137. One such mitigating factor, a defendant's diminished capacity, can reduce the classification of a homicide from murder to the lesser-included offense of voluntary manslaughter when a defendant's intoxication rendered him or her incapable of forming the specific intent required for a murder conviction. *See Hockenhull,* 525 A.2d at 929 ("Under the diminished capacity doctrine, an essential element of the crime of murder is absent when a defendant is so intoxicated as to render him incapable of forming the specific intent to kill."); *see also State v. Edwards,* 810 A.2d 226, 235 (R.I.2002) ("Rhode Island recognizes the defense of diminished capacity that may reduce a crime from murder to manslaughter if defendant is unable to form a specific intent.").

We have also held, however, that in order to merit an instruction concerning the lesser-included offense of voluntary manslaughter due to diminished capacity, a defendant's intoxication must have been "of such a degree as to completely paralyze the will of the [defendant], take from him the power to withstand evil impulses, and render his mind incapable of forming any sane design." *Jimenez,* 882 A.2d at 555 (quoting *State v. Vanasse,* 42 R.I. 278, 281, 107 A. 85, 86 (1919)); *see also Edwards,* 810 A.2d at 235; *State v. Johnson,* 667 A.2d 523, 528–29 (R.I.1995). In addition, we have stated that "a defendant may be cognitively impaired to some extent due to voluntary intoxication and yet still possess the capacity to premeditate and to form the specific intent to commit murder." *Jimenez,* 882 A.2d at 555; *see Amazeen,* 526 A.2d at 1272.

In the present case, there is no evidence in the record that defendant was intoxicated to such a degree as to negate the specific intent necessary for murder, thereby warranting an instruction on the lesser-included offense of voluntary manslaughter due to diminished capacity. The evidence presented at trial merely suggested that defendant had consumed some amount of alcohol during the time period preceding Ms. Spence–Shaw's murder. There is *no evidence* that defendant reached the level of intoxication required by *Vanasse,* 42 R.I. at 281, 107 A. at 86, and its progeny.

The evidence presented at trial concerning defendant's intoxication in the hours

before Ms. Spence–Shaw's murder included defendant's own testimony that he drank about twelve Heineken beers and three-quarters of a bottle of rum. Kelly Stokes testified that she saw defendant drinking both rum and beer when he was with her and the other teenagers during the time preceding Ms. Spence–Shaw's murder, and Patricia Rogalin testified that it seemed to her that defendant had been drinking when she spoke to him by telephone that evening. There was no evidence presented, however, as to defendant's level of intoxication following this alcohol consumption. The record is devoid of any evidence regarding defendant's tolerance for alcohol based on his drinking habits, whether or not defendant ate any food that evening,[21] or how much defendant weighed—evidence that would be relevant in determining defendant's degree of intoxication at the time of Ms. Spence–Shaw's murder. See State v. Sanden, 626 A.2d 194, 199 (R.I.1993) (finding that there was insufficient evidence to establish that defendant was intoxicated to such a degree as to negate the specific intent required for murder when "[t]here was no testimony at trial regarding * * * how much alcohol defendant typically consumed, how much defendant weighed, or how much food defendant had eaten that day, all factors that are relevant to determining whether a person is intoxicated"); see also Johnson, 667 A.2d at 529. Moreover, although defendant testified that he drank three-quarters of a bottle of rum, there is no empirical evidence in the record as to the size of the bottle of rum, except for defendant's statement at trial that the bottle was "about this big."

By contrast, the record is rife with evidence demonstrating that defendant maintained his ability to act in a rational and purposeful manner during the relevant time period. See Jimenez, 882 A.2d at 555–56. The defendant's activities throughout the evening preceding the murder, including engaging in telephone conversations and socializing with neighbors, show that he continued to function rather normally despite the alcohol that he was consuming. Ms. Rogalin testified that even though it seemed to her as though he had been drinking, defendant spoke coherently enough for her to be able to understand what he was saying up until their last telephone conversation ended at 10:30 p.m. In addition, according to defendant's own testimony, he was sober enough at about 11 p.m. to go outside and apologize to three neighborhood teenagers whom he had yelled at a few days earlier for walking on his grass. It is also undisputed that defendant socialized with his teenage neighbors until about 1:00 or 1:30 a.m., during which time he remained coherent enough to decide to call one of his friends in an attempt to purchase marijuana and, when the outdoor gathering broke up, to invite one of the teenage girls to go with him.

The evidence in this case further indicates that, after he had finished socializing with his neighbors, defendant was sober enough to drive from his home in Fall River to Ms. Spence–Shaw's home in Little Compton. Once he arrived at Ms. Spence–Shaw's home, defendant had enough self-protective presence of mind to use a pillow to cushion the blows as he was beating his victim so that he would not suffer any cuts or bruises during the attack. The evidence further indicates that, after beating and raping Ms. Spence–Shaw, defendant dragged her near-lifeless

---

**21.** Although defendant had told the police that he had ordered a pizza from Domino's on the night of the murder, the police investigation revealed that the pizza was actually ordered on the previous night, Friday, May 28.

body into the bathroom, where he filled the bathtub with water and submerged her in it. The defendant then plugged in Ms. Spence–Shaw's hairdryer, turned it on, and placed it into the bathtub. The evidence indicates that defendant cleaned up the bathroom and removed the sheets from the victim's bed. The defendant was then sober enough to safely drive himself back to his home in Fall River.

The defendant's numerous voluntary and conscious actions on the night in question illustrate that defendant's intoxication was *not* "of such a degree as to completely paralyze the will of the [defendant], take from him the power to withstand evil impulses, and render his mind incapable of forming any sane design." *Vanasse*, 42 R.I. at 281, 107 A. at 86; *see also Jimenez*, 882 A.2d at 555–56 (holding that an instruction on the lesser-included offense of diminished capacity manslaughter was not warranted when defendant's pre-crime activities included making phone calls, attending a party, and cooking beans—even though defendant testified that he drank eighteen beers over fourteen hours); *Johnson*, 667 A.2d at 529 (holding that defendant was not entitled to an instruction on voluntary manslaughter due to diminished capacity where "defendant's own testimony demonstrated that he had the capability to run 'errands' on the evening in question and the capacity to make three phone calls"); *Amazeen*, 526 A.2d at 1272–73 (holding that an instruction on voluntary manslaughter due to diminished capacity was not warranted when the evidence showed that defendant was, among other things, able to clean up the body and the crime scene following the murder). Additionally, defendant's detailed memory of the events that transpired throughout the hours preceding Ms. Spence–Shaw's murder further supports the conclusion that his intoxication did not rise to the level required by *Vanasse*, 42 R.I. at 281,

107 A. at 86. *See Jimenez*, 882 A.2d at 557 ("The defendant's actions, * * * coupled with his detailed memory of several events that occurred throughout the period in question, contradict his assertion that his will was so paralyzed as to render him incapable of withstanding evil impulses or forming any sane design."); *Amazeen*, 526 A.2d at 1273 (stating that "[t]he defendant's clear memory of the events leading up to the victim's death" contributed to the holding that an instruction on voluntary manslaughter due to diminished capacity was not warranted).

After carefully reviewing the record in this case, we are convinced that it does not reflect an actual and adequate dispute as to whether or not defendant was suffering from such a diminished capacity as would justify the giving of an instruction on the lesser-included offense of voluntary manslaughter. *See Garcia*, 883 A.2d at 1137; *see also DePina*, 810 A.2d at 778 ("[T]o warrant a voluntary manslaughter charge, the evidence must show an actual and adequate dispute about the presence of a 'mitigating factor[]' that would negate the malice element of first-degree murder."). Based upon the evidence presented at trial, no rational jury could have found that defendant's intoxication was of such a degree as to negate the specific intent necessary for murder. *See Amazeen*, 526 A.2d at 1272. Accordingly, defendant was not entitled to an instruction on the lesser-included offense of voluntary manslaughter due to diminished capacity.

## IV

### The Sentencing Issue

■ The defendant's final argument on appeal is that a sentence of life imprisonment without the possibility of parole was not warranted in this case. This Court reviews an appeal from a sentence of life

imprisonment without the possibility of parole in accordance with the provisions of G.L.1956 § 12–19.2–5:

> "The defendant shall have the right to appeal a sentence of life imprisonment without parole to the supreme court of the state in accordance with the applicable rules of court. In considering an appeal of a sentence, the court, after review of the transcript of the proceedings below, may, in its discretion, ratify the imposition of the sentence of life imprisonment without parole or may reduce the sentence to life imprisonment."

We review a trial justice's decision to impose such a sentence in a *de novo* manner. *See Harnois,* 853 A.2d at 1257; *Tassone,* 749 A.2d at 1119; *Travis,* 568 A.2d at 325.

According to G.L.1956 § 11–23–2, a sentence of life imprisonment without the possibility of parole may be imposed in a first-degree murder case when one of seven enumerated grounds is present. *See State v. Pacheco,* 763 A.2d 971, 982 (R.I.2001) ("The penalties for murder listed in § 11–23–2 are enumerated in the alternative, thereby requiring that the jury find only one of seven conditions in order to trigger consideration of the 'not eligible for parole' provision.").[22] The two grounds relevant to the present case are: (1) when the first-degree murder was "committed intentionally while engaged in the commission of another capital offense or other felony for which life imprisonment may be imposed"; and (2) when the first-degree murder was "committed in a manner involving torture or an aggravated battery to the victim." Section 11–23–2.

On February 8, 2001, the jury in this case returned a verdict finding defendant guilty of the first-degree murder of and first-degree sexual assault upon Ms. Spence–Shaw. Immediately thereafter, following arguments by counsel, the trial justice instructed the jury to return to the deliberation room and reach a determination as to whether defendant's murder of Ms. Spence–Shaw involved torture or an aggravated battery, and/or was an intentional killing by defendant while he was engaged in the commission of first-degree sexual assault. Although § 11–23–2 requires only that one of these circumstances be present before the court may impose a sentence of life imprisonment without the possibility of parole, the jury found beyond a reasonable doubt that *both* of these aggravating factors were present in the instant case.

The trial justice thereafter conducted a presentence hearing, at which both of Ms. Spence–Shaw's sons addressed the court about the devastating impact that their mother's murder has had upon them and their families. The court also heard arguments by counsel for both parties. Defense counsel addressed the court on behalf of defendant (who declined to speak on his own behalf), acknowledging the horrific nature of the crime, but arguing that there were mitigating factors which weighed against the imposition of a sentence of life imprisonment without the possibility of parole. Specifically, defense counsel stressed defendant's youth, the fact that he has a son whom he has supported both financially and emotionally, the fact that his prior criminal involvement was "predominately alcohol and drug relat-

---

**22.** If one or more of the enumerated grounds is present in a particular case, G.L.1956 § 12–19.2–4 directs the trial court to "consider evidence regarding the nature and circumstances of the offense and the personal history, character, record, and propensities of the defendant which are relevant to the sentencing determination" before, in its discretion, sentencing the defendant to either life imprisonment without the possibility of parole or, in the alternative, to life imprisonment.

ed," and the fact that defendant "is the product of a dysfunctional family." Defense counsel pointed out that defendant's father abandoned his family when defendant was still young and that defendant's stepbrother, with whom he was close, committed suicide, which put defendant "on the road of abuse of alcohol." Defense counsel argued that "Jeremy Motyka is, is not beyond salvation, is not beyond rehabilitation, and * * * can, in fact, be saved." On appeal, defendant argues that, because of these mitigating factors, the sentence imposed in this case was excessive and, thus, this Court should restore defendant's eligibility for parole.

After considering all of the evidence and materials before her, the trial justice sentenced defendant to life imprisonment without the possibility of parole for the murder of Ms. Spence–Shaw. At the moment of sentencing, the trial justice made the following remarks, which cogently summarize the considerations that motivated her to impose such a sentence in this case:

"On May 29th, 1999, Angela Spence–Shaw was murdered and raped. Subsequent to her death, the seminal fluid of [defendant] was found buried deep in her vaginal cavity * * * irrefutable evidence that [defendant] sexually assaulted this woman. And not only did he sexually assault Angela Spence–Shaw, he beat her until her body was so badly broken, that there was no chance of her living, in all probability, at that point.

"But [defendant] was not satisfied with that brutal beating; a beating that left her with broken bones, torn, ripped muscles, an ear almost severed, the skin scraped off her face, her internal organs damaged so badly, that it was difficult to listen to the Medical Examiner describe the pain she must have suffered as a result of those injuries; that he wasn't

satisfied with that. He took her near-lifeless body, and to make sure that she was going to be good and dead, he placed her body in the bathtub and filled it with water and drowned her. And to make sure that the water, the drowning was going to leave her absolutely, positively dead, he puts the hair dryer into the tub to make sure that she was completely finished off. And in spite of the scientific evidence that places [defendant] inside of this woman, to this day, he has refused to step forth, admit any kind of responsibility, admit any kind of regret, any kind of sorrow, and admit any kind of remorse. He has refused to come forth and at least indicate that he knows that he must try to make some type of atonement for the heinous act that he committed upon Angela Spence–Shaw.

* * *

"The Court has taken a look at the Presentencing Report, and even pursuant to the request of the Court, that the Probation Officer gather evidence for the Court to consider in making this decision, [defendant] * * * would not cooperate with my Probation Officer. You would not talk to her, you would not provide her with any information about your life, your circumstances, that would help us get an understanding of how something like this would and could happen.

"You've spoken with the representative of the Public Defender's office, and assuming the Court is to determine that that information is credible, I guess I know a little bit about you now, a little bit about your background, about your growing up. I cringe at the notion, however, of viewing your family situation as dysfunctional. You've had tragedies in your life, like a lot of people have had tragedies in their life. The Court's

aware of the fact that your father did abandon his family; that you've suffered the loss of your stepbrother; and that other things have happened in your family. But the Court looks at * * * how other people approached tragedy. They did not make a decision to cope with their tragedy by getting involved with alcohol abuse, by getting involved with commission of crimes, or by committing an ultimate act of violent, senseless murder and rape.

" * * * [T]he Court, as the prosecutor points out, is aware of your prior criminal contacts, your arrests for D.W.I. in the State of Massachusetts, the fact that you were out on bail for kidnapping and high-jacking and assault charge against someone who was another stranger to you, of the violence that you perpetrated against your roommate, your friend.

* * *

"This Court is very mindful of the fact that you are a young man. You are 25 years old now, and you were younger when this crime was committed. You do have a full life ahead of you. The Court is mindful of the fact that you do have a child. The idea of taking a person your age and, essentially, making the decision that you are beyond rehabilitation, that you are beyond all hope, is very difficult for this Court * * *.

"But * * * nothing that has happened in this case, gives me cause for hope. Absent some expression of responsibility, remorse, some expression that you understand what has happened, that you understand and accept your behavior and the consequences of your behavior, absent something that would allow this Court to think that perhaps in the future, you could be rehabilitated, that you could find some meaning in your life, that you could be, once again, a produc-

tive citizen in our society, there is very little that I can do and very little that I can conclude, other than that at this particular point, there is no hope."

██ In determining whether a sentence of life imprisonment without the possibility of parole was warranted in the present case, this Court is obligated to "examine the record, the findings of the trial justice, and the personal character, record, and propensities of the defendant," *Tassone*, 749 A.2d at 1119, and then exercise our "own independent judgment and discretion in determining the appropriateness of the sentence." *Id.* In undertaking this review, it is incumbent upon this Court to "examine the record as the trial justice has done and to exercise our independent judgment in respect to the aggravating circumstances found by the jury and adopted by the trial justice and to consider these aggravating circumstances together with any matter in mitigation." *Travis*, 568 A.2d at 325.

The jury found that two aggravating circumstances were present in this case— each of which, standing alone, would be sufficient to authorize the court to impose a sentence of life imprisonment without the possibility of parole. *See Pacheco*, 763 A.2d at 982. After reviewing the record, it is our opinion that the evidence in this case overwhelmingly supports the jury's conclusion that defendant committed the murder intentionally while engaged in the commission of first-degree sexual assault and that he committed the murder in a manner involving both torture and an aggravated battery. Evidence presented at trial, including Dr. Laposata's testimony about the injuries to Ms. Spence–Shaw's genital area, established that Ms. Spence–Shaw was sexually assaulted before she was murdered. Moreover, the DNA evidence in this case conclusively established that it was defendant who raped her. There was

also evidence presented at trial regarding the extensive injuries, both internal and external, that defendant inflicted upon Ms. Spence–Shaw. In addition, Dr. Laposata testified that Ms. Spence–Shaw was still alive when she was raped and then placed underwater in the bathtub. Furthermore, due to the nature of the decedent's injuries, her ability to experience pain remained intact throughout the violent attack, thereby allowing her to suffer from a significant amount of pain prior to her death. The infliction of these horrific injuries, combined with the extent of Ms. Spence–Shaw's suffering, certainly amounted to torture and aggravated battery. Given this evidence, we are in agreement with the jury as to the presence of these two aggravating circumstances.

We have carefully considered all of the evidence before us in this case, including the mitigating factors raised by defense counsel, the findings of the trial justice, and the personal character, record, and propensities of the defendant. We are in agreement with the thoughts expressed by the trial justice as quoted above. Those thoughts more than adequately summarize the factors militating in favor of the imposition of a sentence of life imprisonment without the possibility of parole in this case. It would be superfluous for us to again recite the numerous factors that justify imposing such a sentence upon the defendant. We agree with the conclusion of the trial justice that none of the mitigating factors set forth by defense counsel outweighs the aggravating factors that were established by the evidence in this case. In the exercise of our independent judgment and discretion, we hold that the sentence of life imprisonment without the possibility of parole was appropriate.

## Conclusion

For the reasons set forth in this opinion, we affirm both the judgment of conviction and the sentence of life imprisonment without the possibility of parole.

Justice SUTTELL did not participate.